Margaret GRABAU, Plaintiff
and Appellant,

v.

HARTFORD ACCIDENT & INDEMNITY
COMPANY, a corporation, De-
fendant and Respondent.

Civ. No. 8382.

Supreme Court of North Dakota.

March 17, 1967.

Mackenzie & Jungroth, Jamestown, for plaintiff and appellant.

Hjellum, Weiss, Nerison & Jukkala, Jamestown, for defendant and respondent.

PAULSON, Judge.

This is an action upon an accident policy issued to Kenneth E. Grabau during his lifetime, insuring against accidental bodily injury and death. The defendant company, on October 24, 1964, issued a policy to Grabau which provided as follows:

> *"INSURING AGREEMENTS*
> *"Accidental Bodily Injuries*
> *Defined*
>
> *"With respect to* accidental bodily injuries sustained by the Insured while this policy is in force from which loss results directly and independently of all other causes, hereinafter called accidental bodily injuries,
>
> *"I. Coverage A—Accident Death and Dismemberment Benefit*: To pay a benefit stated in the Table of Benefits if accidental bodily injuries result in any loss stated in said table, provided such loss shall occur within 90 days from the date of accident causing such loss. The benefit payable for any such loss shall be the benefit stated opposite such loss in said table and the Principal Sum stated therein shall be the Principal Sum stated in Item 7 of the declarations.

> "Table of Benefits
>
> "For loss of
>
> > "Life.......The Principal Sum....."

There were also certain exclusions, among which are the following:

> *"EXCLUSIONS*
>
> "This policy does not apply to death, disability or any other loss caused or contributed to by:
>
> > "(a) sickness or disease or medical or surgical treatment therefor except pus-forming infection which shall occur through an accidental cut or wound;
> > * * *."

The portion of the policy with which we are concerned is the one with reference to insurance against loss of life. The policy was in full force and effect during all of the times herein mentioned and death occurred and proper proof of death was filed within the time limits set forth in the policy.

The insured was 59 years of age and in apparent good heath, and he resided in the city of Jamestown, North Dakota. Mr. Grabau, accompanied by a companion, went on a hunting trip on October 25, 1964, to Montana, where they commenced hunting on the morning of October 26, 1964. The insured was shooting a model 30–06 rifle. He fired three shots at an antelope in the early afternoon of the 26th of October, 1964. Immediately after firing the third shot the insured complained that he had suddenly gone blind. Thereafter he recovered his vision, but he continued to suffer from a very severe headache. The headache continued; thus the hunters returned to Jamestown, North Dakota, on October 27, 1964. Grabau then sought treatments from the Cor-Win Health Clinic, which treatments did not relieve his headache. He consulted a Doctor Hogan of Jamestown prior to November 5, 1964, and was advised to return home and rest. Grabau, on November 5 and 6, suffered fainting

spells in his home and a consequent partial paralysis of the left side of his face and of his left arm. Doctor John Van Der Linde, of Jamestown, was summoned. The insured was immediately hospitalized, whereupon further diagnosis and tests indicated that he was suffering from a hemorrhage. Doctor Van Der Linde then referred Mr. Grabau to Doctor Lee A. Christoferson of Fargo, North Dakota. Further tests revealed the presence of an aneurysm and an operation was performed. Mr. Grabau died on November 18, 1964, at a Fargo hospital. An autopsy was performed and disclosed that the cause of death was a rupture of the blood vessel at the point of the congenital aneurysm.

The defendant declined to pay under the terms of the policy and this action was brought to recover the sum of $5,000, pursuant to the terms of coverage of this policy. The defendant's answer denies death from accidental means and further sets forth that death resulted from a natural pre-existing condition.

The case was tried to the court and a judgment of dismissal of plaintiff's action was entered.

The plaintiff and appellant, who is the surviving widow and sole beneficiary under the policy, has appealed and demanded a trial de novo.

The issues to be determined are as follows:

1. Whether or not Kenneth E. Grabau died by accidental means, directly and independently of all other causes; and

2. Did sickness or disease cause or contribute to Grabau's death?

The above issues involve a construction of the provisions of the policy in this particular suit. The plaintiff contends that the insured's death was caused by accidental means, even though the insured was suffering from a pre-existing disease and that, if a subsequent accident is the proximate cause

of death, a recovery may be had under the policy, even though a diseased or infirm condition actually contributes to the cause of death, provided that the accident sets in progress the chain of events leading directly to death if the same is the prime or moving cause.

■ The general rule is that the mere fact that the insured is afflicted with some disease or infirmity at the time of an injury will not preclude recovery upon an accident insurance policy if an accident is the direct or proximate cause of death or disability, even though the policy excepts death or injury caused by disease or infirmity. 29A Am.Jur., "Insurance," Sec. 1212, p. 351; 84 A.L.R.2d, Sec. 7, p. 196.

This court has defined the term "accidental means" in Jacobson v. Mutual Ben. Health & Accident Ass'n, 69 N.D. 632, 289 N.W. 591, as follows:

"1. The term 'accidental means' in an insuring clause of a health and accident insurance policy which insures against loss of life resulting directly and independently of all other causes from bodily injuries sustained through purely accidental means includes such means as produce effects which are not their natural and probable consequences. An effect which does not ordinarily follow, an effect which can not be reasonably anticipated from the use of those means, an effect which the actor did not intend to produce and can not be charged with the design of producing, is an effect produced by accidental means."

Likewise, in Jacobson v. Mutual Ben. Health & Accident Ass'n, 70 N.D. 566, 296 N.W. 545, 555, this court said:

"An injury may be said to be the sole producing cause of death when it stands out as the predominating factor in causing death. The active efficient cause that sets in motion a train of events which bring about a result without the intervention of any force from a new and in-

dependent source may be regarded as the direct, proximate and sole cause. * * "

The plaintiff cites the *Jacobson* decisions as controlling in this case. The language of the policy in this case is similar to that of the *Jacobson* cases. However, the facts are vastly different because in the *Jacobson* cases the insured, in good health while regularly employed at his occupation, was subjected to great bodily strain which resulted in injury to his heart, subsequent illness, and ultimate death. The medical testimony corroborated the same. In this case the insured voluntarily participated in the hunting trip for recreation. He was an experienced hunter of upland and big game, and the attendant excitement of the hunt was not anything of an unusual nature. The record does not indicate that there was any particular strain as a result of the hunt. The undisputed testimony of the insured's hunting companion shows that the only hunting which was done by himself and Mr. Grabau was on October 26, 1964, from approximately seven o'clock in the morning until early afternoon, and that nearly all of this hunting consisted of traveling in a car and observing the area in order to locate the antelope. The testimony further shows that Grabau walked about 100 yards and, in addition, that he carried a 30–06 rifle and fired the usual 150-grain bullet.

The plaintiff urges that the testimony of Doctor Van Der Linde is controlling in that such evidence conclusively shows that the death of Kenneth E. Grabau resulted from the excitement of the hunt, the shooting at the running game, and the concussion of the gun, and that the same were the precipitating factors which caused a rupture of the aneurysm. Doctor Van Der Linde further testified, however, that the exertion and excitement were not the direct and independent causes of the death, but that in effect they contributed with the aneurysm to the rupture of the aneurysm and consequent death.

The plaintiff further contends that the case of Druhl v. Equitable Life Assur.

Soc., 56 N.D. 517, 218 N.W. 220, 60 A.L.R. 962, buttresses her view. The *Druhl* case is distinguished from the case at bar in that Mr. Druhl had a pre-existing condition, but the same was dormant, was not congenital, and did not become reactivated until he suffered a severe trauma. In addition, the medical testimony of the doctor in the *Druhl* trial conclusively showed that Druhl's pre-existing physical condition—that is, the presence of the adhesions—was not the exciting factor in causing the death.

■ The plaintiff and the defendant in this case place great reliance upon the testimony of the doctors, because both parties introduced such evidence. The testimony of the several witnesses—that is, the weight and credibility of such testimony, including that of the medical experts—was for the court. 32 C.J.S. Evidence § 567, p. 575; 32 C.J.S. Evidence § 569(1), p. 599. The medical testimony of Doctor Van Der Linde is of sufficient importance to quote excerpts thereof from the transcript.

"Q. Was there any talk about an aneurysm at that time?

"A. Yes.

"Q. Will you explain what you mean by an aneurysm?

"A. An aneurysm is a dilation of a blood vessel, an abnormal dilation of a blood vessel, usually localized but can be diffused and they occur in all parts of the circulation system. They are common in the aorta which is the big artery that leaves the heart and they are also very common around the base of the brain, of the arteries that supply the brain.

*    *    *    *    *    *

"Q. Could there have been precipitating factors that brought this about?

"A. Well, I'm sure that the excitment [sic] of the hunt and the shooting at the running game and the concussion of the gun were precipitating factors.

*    *    *    *    *    *

"Q. Were you first able to determine there was a ruptured aneurysm following the report from Doctor Christoferson, is that the first time you definitely state there was a ruptured aneurysm?

"A. No, I strongly suspected this ruptured aneurysm the first time I saw him at home for this illness.

\*    \*    \*    \*    \*    \*

"Q. Now Doctor Vaner [sic] Linde, do you have an opinion based upon a reasonable medical probability of what caused this aneurysm to rupture?

"A. Yes, *it seems reasonable to assume that the exertion of the hunt, the excitement of watching these running game* and then firing at them was the thing that ruptured the aneurysm." (Emphasis added.)

However, on cross-examination, Doctor Van Der Linde testified as follows:

"Q. Did you examine the autopsy report?

"A. I saw it, yes. I got—I didn't see the original report but I got a letter from Doctor Christoferson summarizing the highlights of the autopsy report.

"Q. Was there any reference in that to trauma to any part of the brain or any part of the head?

"A. May I look at the report? Can I read the thing, it's not very long.

"THE COURT: Surely.

"A. 'An autopsy was obtained—

"MR. NERISON: I thought you wanted to read it to yourself, if you want it read—

"THE COURT: That is up to you.

"MR. NERISON: No, I thought you were going to read it and then tell us whether there was any mention of trauma.

"A. No trauma in the sense of external trauma; *there was trauma to the brain from the blood clot.*

\*    \*    \*    \*    \*    \*

"Q. What physical results would there be from the excitement of the hunt?

"A. The speed up in the pulse rate and an increase in the blood pressure would be the two cardinal things.

"Q. Would that hold true to the exertion too?

"A. Yes.

\*    \*    \*    \*    \*    \*

"Q. And do you know what is the most direct precipitating factor in the rupture of an aneurysm?

"A. Well, strain of any kind. I suppose there are a number of things that people have to do which may cause strain, using the bathroom for bowel movements, sexual excitment [sic], exercise, of course.

"Q. Fright?

"A. Fright, yes.

"Q. Any of these alone could do that, couldn't they?

"A. Any one could, yes.

\*    \*    \*    \*    \*    \*

"Q. Doctor, you testified that you felt the exertion and excitement and the firing of the rifle were the precipitating factors which ruptured the aneurysm and ultimately resulted in Mr. Grabau's death. Do you feel that the exertion and excitement was the sole cause of the death of —the direct cause of death? This would not have happened had it not been for the excitement?

"A. That is a fair statement if he had not had the aneurysm, yes.

"Q. So the exertion and the excitement was not the direct and independent cause of the rupture then, of the death?

"A. No, both conditions were necessary. You had to have the aneurysm and he had to have some strain or stress." (Emphasis added.)

It is significant to note that Doctor Van Der Linde states that it seems *reasonable to assume* that the exertion of the hunt, the excitement, and the firing of the gun "was the thing that ruptured the aneurysm." He further states that the rupture of the aneurysm could result from strain of any nature and that such strain could come from ordinary human activity, including exercise, and that the rupture of the aneurysm could occur at any time.

The testimony of Doctor Christoferson is to be given considerable weight, and certain portions of it are hereinafter set forth:

"Q. What is the cause or what are the causes of an aneurysm?

"A. Well, there are really two main causes. The first is a weak spot in the wall of the blood vessel of the brain that is congenital, the patient is born with this, and through the years the pressure inside of the artery gradually distends this weak spot into a blister and keeps enlarging it until either the patient has a hemorrhage from it or dies from some other cause. * * *

"Q. From your examination of Mr. Grabau were you able to determine what the cause of his aneurysm was?

"A. I had an opinion with reasonable medical certainty, yes.

"Q. And what is that opinion?

"A. It was my opinion that this was a congenital aneurysm.

* * * * * *

"Q. Well, Doctor, and the rest of my question is with a reasonable degree of certainty, do you have an opinion as to why the aneurysm ruptured or the blister ruptured?

"A. I have an opinion as to why it ruptured, yes.

"Q. Would you state that opinion, please.

"A. My opinion as to the reason for the rupture was that it finally got so thin that it wasn't able to tolerate the pressure of the blood inside it and therefore the pressure of the arterial blood inside the vessel caused it to rupture.

"Q. Could this be caused by natural causes?

"A. What?

"Q. Would it be the result of natural causes?

"A. It could be, yes.

* * * * * *

"Q. Would a congenital aneurysm be more susceptible to rupture than one caused by arteriosclerosis or the infection you spoke of?

"A. No.

* * * * * *

"Q. Well, Doctor, would it be fair to say that a ruptured aneurysm is not a natural cause of death?

"A. Well, I'd have to ask you to define what is a natural cause of death.

"Q. Well, from a medical viewpoint, now I believe doctors—

"A. From my viewpoint there is no natural cause of death.

"Q. What kind of causes of death are there from your viewpoint?

"A. They are all unnatural.

"Q. Well, let's distinguish it as a difference between natural and accidental.

"A. Fine.

* * * * * *

"Q. Would you say that excitement was a natural or accidental cause, then?

"A. Well, I would say that *excitement, then, would be a more natural*

*cause of death as contradistinguished from accident.*

\*   \*   \*   \*   \*   \*

"Q. Were you able to make that determination within the grounds of reasonable medical certainty from the history and from your knowledge of this case?

"A. Yes, I was.

"Q. What were those factors?

"A. It was my impression that the precipitating factors were the excitement of his hunting plus the explosion of his rifle at the time that he experienced this severe pain and the history documents this I believe with reasonable certainty." (Emphasis added.)

The statements enunciated by Doctor Christoferson add further and greater weight to the conclusion that the death of Kenneth E. Grabau was not caused by an accident nor did it result from accidental means.

■ As this court has said many times, on a trial de novo the findings of the trial court are entitled to appreciable weight, especially when based upon testimony of witnesses who appeared in person before the court. Pauly v. Haas, N.D., 84 N.W.2d 302; Parceluk v. Knudtson, N.D., 139 N.W. 2d 864, 874.

■ The plaintiff has the burden of proving by the preponderance of the evidence that the insured died from accidental means. Jacobson v. Mutual Ben. Health & Accident Ass'n, supra.

In this case the testimony conclusively shows that there was only ordinary exertion, that there was some excitement, and that there was only slight evidence of any recoil from the discharge of the firearm. It is not unlike Hodges v. Mutual Ben. Health & Acc. Ass'n of Omaha (Wash.), 15 Wash.2d 699, 131 P.2d 937, 939. In that case the insured who was in apparent good health attended a dance. The insured's death resulted from a heart attack which occurred while the insured was dancing. The court held:

" \*   \*   \* the insured was doing an ordinary and customary act in his usual way and no unexpected event interposed itself to cause injury. The dance was described as a fast fox trot. That dance, so far as the facts indicate, was no different from any other modern lively dance and called for no violent action other than that which was incident to the activity of dancing and readily foreseeable by the insured. The insured's death was not caused by an unexpected event which happened by chance.

"True, death is in most instances unexpected, but to hold that all unexpected deaths are accidental and that insurance companies which insure against accidental death are liable on that ground would amount to a rewriting of such policies by the courts and put into each of those policies an intent that was never conceived by either the company or the insured at the time the policies were written. That, the courts cannot do. Courts may only determine the legal effect of contracts."

In Commercial Casualty Ins. Co. v. Mathews, 57 Ga.App. 446, 195 S.E. 887, 892, the court said:

" \*   \*   \* That when the facts show that no unforeseen, unexpected, unusual, unintentional, or involuntary muscular effort or exertion occurred in the doing of the act which preceded the injury, the injury cannot be regarded as resulting from accidental means; \*   \*   \*."

Words & Phrases, Vol. 1A, "Accidental Means," p. 127.

■ It is our holding that the death did not result from accidental means and that the beneficiary cannot recover.

The judgment is hereby affirmed.

TEIGEN, C. J., and STRUTZ, ERICKSTAD and KNUDSON, JJ., concur.