**Ingrid GARDEBRING, Plaintiff and Appellant,**

v.

**Joseph Arthur RIZZO, Defendant and Appellee.**

**Civ. No. 9425.**

Supreme Court of North Dakota.

July 31, 1978.

---

1. *United States v. LaSalle National Bank*, —— U.S. ——, 98 S.Ct. 2357, 57 L.Ed.2d 221, 1978.

Chapman & Chapman, Bismarck, for plaintiff and appellant; argued by Daniel J. Chapman, Bismarck.

Ottmar & Pope, Jamestown, for defendant and appellee; argued by Georgia M. Pope, Jamestown.

ERICKSTAD, Chief Justice.

This is an appeal by Ingrid Gardebring, plaintiff and appellant, from the amended judgment of the Burleigh County District Court modifying the visitation rights of Joseph Rizzo, defendant and appellee, with their daughter, Sophia.

Ingrid and Joseph were granted a divorce in August, 1976, by the Koochiching County District Court in the State of Minnesota. Sophia was born of this marriage on September 4, 1974. In the Minnesota judgment, Ingrid was awarded custody of Sophia, subject to the visitation rights of Joseph as set out in the judgment. Basically, Joseph was entitled to have Sophia with

him in International Falls, Minnesota, his place of residence, for one week, every-other-month. In the months when he did not have Sophia with him for the week-long visitation in Minnesota, he was entitled to have Sophia with him for one weekend in the city of Ingrid's residence.

On December 16, 1976, Ingrid commenced an action to modify the visitation rights given to Joseph in the Minnesota judgment. On December 17, 1976, the Burleigh County District Court granted a preliminary restraining order terminating all of Joseph's visitation privileges, pending the outcome of an order to show cause hearing scheduled for January 24, 1977. That hearing was not held until April 4, 1977. On April 21, 1977, Joseph filed an answer to the complaint.

On July 8, 1977, the matter of the modification of the visitation rights was heard before the Burleigh County District Court. At the end of that proceeding, the district court determined that Ingrid had not established that Joseph's extended visitations with Sophia were not in the best interests of the child. The district court modified the visitation provisions, however, by eliminating the six one-week visitations with Joseph in Minnesota, and substituting, therefor, a six-week visitation period with Joseph in Minnesota during the summer months. Judgment was entered accordingly on July 13, 1977.

Ingrid then filed a motion for new trial and for amendment of the findings and judgment. Pursuant to that motion, a hearing was held on July 29, 1977. The district court denied the motion for a new trial, but did amend the findings of fact and conclusions of law. An amended judgment was entered on September 7, 1977. It is from that amended judgment that Ingrid appeals to this court.

Ingrid's objective in seeking a modification of the Minnesota judgment was to secure a limitation in Joseph's visitation rights in Minnesota. She contended that it would be in the best interests of Sophia to limit the visitation rights of Joseph to visits with Sophia in her home in North Dakota. To understand why Ingrid believed it to be

in the best interests of Sophia to so limit the visitation rights of Joseph, it is necessary to review the evidence brought out at the trial.

Ingrid and Joseph separated in September, 1975. At that time, Ingrid took Sophia and moved into her parents' home in Bismarck, North Dakota. Ingrid was living with her parents at the time of trial in their new home in Mandan, North Dakota. She had become a North Dakota resident prior to the commencement of the action.

Following the separation, after the divorce action was commenced but before it was concluded, Joseph came to Bismarck in November, 1975, to visit Sophia. Instead of visiting with Sophia in Bismarck as he had agreed to do, Joseph took Sophia to his home in International Falls, Minnesota. At that time, there was no custody order in effect, but Ingrid was able to obtain a court order to regain custody of Sophia.

The next visitation period that Joseph had with Sophia was from the end of December, 1975, to January 4, 1976. Ingrid testified that at the time Joseph came to take Sophia to International Falls, Sophia clung to her and did not want to go. Ingrid also testified to several changes that she noticed in Sophia's behavior upon her return. Ingrid testified that upon Sophia's return she clung to her and that she suffered from diaper rash and diarrhea. According to Ingrid, Sophia's sleeping habits became irregular and she often cried in her sleep. She also testified that there was a definitely observable regression in Sophia's behavior.

The next two visitations in April and August, 1976, were also week-long visitations in International Falls, Minnesota. According to Ingrid, these visitations went smoother, but there were problems that followed them. Sophia would cling to Ingrid and Ingrid's parents more than before the visitation and would get upset when Ingrid's parents went to work. It should be noted that the August visitation was the first visitation period held pursuant to the divorce judgment entered earlier that month.

Joseph did not take advantage of his right to see Sophia in Bismarck for a weekend in September, 1976. Nor did he have Sophia with him in International Falls for a week-long visitation in October as he was entitled to do. There is a conflict in the testimony as to why this October visitation fell through, but apparently an agreement on the visitation for that month could not be reached between the parties.

In November, 1976, Joseph arranged for a weekend visitation in Bismarck with Sophia. Instead of visiting with Sophia in Bismarck, he took her to International Falls in violation of the arrangement worked out with Ingrid for that weekend. The attorneys for both sides became involved in the matter, and Sophia was finally returned several days later by Joseph. Ingrid testified that when Joseph returned Sophia to her, Sophia was not sufficiently clothed for the prevailing weather conditions and she was wearing soiled underpants. Ingrid also testified that following that visitation, Sophia swore a lot, bit herself, clawed her own face, spit, threw severe temper tantrums, and that her sleeping habits deteriorated. According to Ingrid, all of this behavior was uncharacteristic of Sophia prior to the November visitation. Ingrid further testified that this behavior continued for three weeks or more after the visitation.

Dr. Olaf Gardebring, Ingrid's father, also testified at the trial in regard to the behavior of Sophia following the visitation periods. Dr. Gardebring's testimony as to the behavior of Sophia was generally in accord with the testimony of Ingrid. In addition, Dr. Gardebring, who has a Ph.D. in clinical psychology, testified that, in his professional opinion, Sophia was in a state of agitated depression following the November, 1976, visitation.

In addition to Dr. Gardebring, Ingrid presented two other expert witnesses, Dr. Myron Burger and Paige Pederson. Dr. Burger has a doctorate in clinical psychology and at the time of the trial was engaged in private practice in Mandan. Paige Pederson has a Master degree in psychology and has worked with the Bismarck Early Childhood Education Program as an educational evaluator. Essentially, these three experts were in agreement that the formative years of a child are the first six years. During this time, they testified, continuity is very important for a child, and it is very disruptive to the child to have to have week-long visitations away from his "home base". These visitations, the experts agreed, could have a permanent and lasting effect upon the psychological and emotional development of the child.

Dr. Burger further testified that, in his opinion, the best solution for a child of a divorced couple would be to give the child to one parent, and for all practical purposes consider the other parent as non-existent. Dr. Gardebring also testified as to the propriety of visitation rights and stated that he agreed with the following from *Beyond the Best Interests of the Child*, Goldstein, Freud and Solnit (The Free Press 1973).

"Once it is determined who will be the custodial parent, it is that parent, not the court, who must decide under what conditions he or she wishes to raise the child. Thus, the noncustodial parent should have no legally enforceable right to visit the child, and the custodial parent should have the right to decide whether it is desirable for the child to have such visits. What we have said is designed to protect the child and the custodial parent. At the same time the state neither makes nor breaks the psychological relationship between the child and the noncustodial parent, which the adults involved may have jeopardized. It leaves to them what only they can ultimately resolve." *Beyond the Best Interests of the Child, supra* at 38.

Consistent with the above philosophy, the authors of *Beyond the Best Interests of the Child* in the chapter "Provisions for a Model Child Placement Statute" not only recommend a provision which adopts the principal of the "least detrimental available alternative" (¶ 10.6), which stresses the importance of "maintaining on a continuous, unconditional, and permanent basis a relationship with at least one adult who is or will be-

come the child's psychological parent", and the "state policy of minimizing disruption" (¶ 30.1), but also recommend a provision which would make all placements "unconditional and final" (¶ 30.5).[1]

It is in light of this testimony of the experts and the behavior of Sophia following the visitations that Ingrid contends it would be in the best interests of Sophia that the visitation rights of Joseph be severely limited, and it is in this light that Ingrid contends that the district court's findings resulting in the amended judgment are clearly erroneous.

Joseph disagrees with the contention that it would be in the best interests of Sophia to severely limit his visitation rights. First of all, he testified that he did not notice any of the behavioral problems mentioned by Ingrid when Sophia was with him in International Falls. Instead, he testified in effect that Sophia received the proper care and got along very well during the visitation periods in International Falls. He also emphasizes that Sophia was admitted by all persons to be a well-adjusted, very intelligent child at the time of trial. Thus, he contends, there have been no lasting harmful effects on Sophia as a result of his visitation privileges. Joseph asserts that the only expert to spend more than one-half hour with Sophia was Dr. Gardebring and that he is not a disinterested witness. Finally, Joseph contends that limiting him to visits in North Dakota would be tantamount to terminating his visitation rights under the circumstances of this case.

The district court determined that it would not be in the best interests of the child to eliminate the extended visitation rights of Joseph. Instead the court modified the visitation rights by providing for one extended visitation period of six weeks in lieu of the six one-week visitations in Minnesota, while leaving intact the weekend visits in the city of Ingrid's residence every-other-month. The relevant amended findings of fact of the district court are:

"5.

"That the Court finds that the minor child of the parties indicated behavioristic changes after visitations with her father and that such changes included, biting and scratching herself, spitting, swearing, difficulty in speaking and throwing tantrums. That the Court finds, however, that the changes testified to were not so

1.     "PARA. 10.6    LEAST DETRIMENTAL AVAILABLE
    ALTERNATIVE

    "The least detrimental available alternative is that child placement and procedure for child placement which maximizes, in accord with the child's sense of time (Para. 10.5), the child's opportunity for being wanted (Para. 10.2) and for maintaining on a continuous, unconditional, and permanent basis a relationship with at least one adult who is or will become the child's psychological parent (Para. 10.3)."

    "PARA. 30.1    STATE POLICY OF MINIMIZING DISRUPTION

    "It is the policy of this state to minimize disruptions of continuing relationships between a psychological parent (Para. 10.3) and the child. The child's developmental needs are best served by continuing unconditional and permanent relationships. The importance of a relationship's duration and the significance of a disruption's duration vary with the child's developmental stage."

    "PARA. 30.5    FINAL UNCONDITIONAL DISPOSAL

    "All placements shall be unconditional and final, that is, the court shall not retain continuing jurisdiction over a parent-child relationship or establish or enforce such conditions as rights of visitation." Goldstein, Freud, Solnit, Beyond the Best Interests of the Child, Ch. 7, "Provisions for a Model Child Placement Statute, Paragraphs 10.6, 30.1, 30.5 (The Free Press 1973).

significant as to be detrimental to the emotional and physical well being of the child.

"6.

"That the Court finds that the visitation arrangements set forth in the Minnesota judgment is contrary to the best interests of the child and further finds that the alternate visitation proposed by Plaintiff, namely: denied Defendant all visitation except such visitation as would be allowed at the discretion of the Plaintiff, said visitations to take place in the residence of Plaintiff, would be tantamount to a complete termination of Defendant's parental rights in his minor child.

\*    \*    \*    \*    \*    \*

"8.

"That the Court finds that it would be in the best interests of the child to eliminate the periodic one-week visits as provided for in the Minnesota decree and that it would be in the best interest of the child to permit a visitation of six weeks at Defendant's home in International Falls, Minnesota, during the summer months."

Ingrid, in this appeal, asserts that it was improper for the district court, sitting without a jury, to arbitrarily disregard the uncontradicted and unimpeached opinion evidence of the experts. Furthermore, she asserts that the findings of the district court which are contrary to the testimony of the experts are clearly erroneous. She asks that this court reverse the finding of the district court relative to the visitation period of six weeks in the summer and remand the matter for further testimony on the issue of visitation rights to be accorded the father.

Joseph, on the other hand, asserts that the findings of the trial court provide him with an opportunity to establish a meaningful and long-lasting relationship with his child. This, he asserts, is not detrimental to the best interests of the child. He also contends that the district court did have evidence before it that the emotional and physical well-being of the child were not

being harmed by the extended visitations. Furthermore, he contends that the refusal of the district court to adopt the theory propounded by the experts does not necessarily constitute a disregard of the law and evidence.

▇▇▇ The rule in North Dakota as to the effect to be given expert testimony is clear. The credibility of expert witnesses, and the weight to be given their testimony, are matters to be determined by the trier of facts. *Waagen v. R. J. B.*, 248 N.W.2d 815, 819 (N.D.1976); *Grabau v. Hartford Accident & Indemnity Co.*, 149 N.W.2d 361 (N.D.1967); *Fisher v. Suko*, 111 N.W.2d 360, 363 (N.D.1961); *In re Heart River Irr. District*, 78 N.D. 302, 330, 49 N.W.2d 217, 232 (1951). We have also said that the trier of fact is not required to accept undisputed testimony, even of experts. *Waletzko v. Herdegen*, 226 N.W.2d 648, 653 (N.D.1975). Finally, in Syl. ¶ 2 of *In re A. N.*, 201 N.W.2d 118 (N.D.1972), we said:

"2. While expert opinions are helpful, the courts are not required to accept such opinions as being conclusive."

These cases do not stand for the proposition, though, that the trier of fact can arbitrarily disregard the testimony of experts, or for that matter, the testimony of any witness.

▇▇▇ In this case, the district court was the trier of fact with the responsibility for determining the credibility of the witnesses and the weight to be given their testimony. After reviewing the evidence presented at the trial, we do not believe that the district court arbitrarily disregarded the testimony of the expert witnesses.

First, there was evidence presented to the court which would support its finding that the changes in the behavior of Sophia following the visitations were not so significant as to be detrimental to the emotional and physical well-being of the child. The fact that the symptoms of regression remained only for a short period of time after each visit, that at the time of the trial the child was well-adjusted, and that the most severe changes in Sophia's behavior oc-

curred after Joseph improperly took her to International Falls without advance warning, all tend to support the district court's finding. In addition, the court had the testimony of Joseph that Sophia did not display any abnormal behavior when she was with him. In light of the evidence indicating Sophia's ability to make the adjustments necessitated by the periodic changes in home environments, and the harsh alternative that the experts recommendations would involve, we believe that the evidence was sufficient to support the district court's findings.

Second, the district court was not bound to accept the theory propounded by the experts that visitations away from the child's "home base" are per se detrimental to the best interests of the child. Nor was the court required to embrace the view propounded in *Beyond the Best Interests of the Child*, by Goldstein, Freud and Solnit, and agreed to by both Dr. Gardebring and Dr. Burger that the non-custodial parent should have no legally enforceable right of visitation, and that the matter of visitation should be left entirely to the discretion of the custodial parent. It does not follow that because the district court did not adopt and apply that theory that it arbitrarily disregarded the testimony of the expert witnesses.

We have commented on the theories contained in the book, *Beyond the Best Interests of the Child*, before. In *Filler v. Filler*, 219 N.W.2d 96 (N.D.1974), we were dealing with a case where the district court had modified and extended the visitation rights of the non-custodial parent. Although in that opinion we said:

"This case may be an illustration of the validity of the theses that we would serve the best interests of the child, or, otherwise stated, select the 'least detrimental available alternative' by giving sole custody of children to one parent, who is allowed to make decisions as to visitation rights by the other," 219 N.W.2d at 98,

we nevertheless held that the order of the court extending the visitation rights was proper.

In *Jordana v. Corley*, 220 N.W.2d 515 (N.D.1974), we again referred to the book *Beyond the Best Interests of the Child*, saying:

"The authors' goal of using 'each child's placement as an occasion for protecting future generations of children by increasing the number of adults-to-be who are likely to be adequate parents' is a laudable goal we can all agree upon. The means suggested by the authors of reaching this goal contain many ideas which may be applied within the existing framework of law and many which represent such a shift in policy that they are better left to the Legislature." 220 N.W.2d at 523.

The adoption of the theory that the non-custodial parent should have no legally enforceable right of visitation would represent a major shift in policy in this state. The policy that has been followed in this state is in accord with the policy applied by the Wisconsin Supreme Court in *Marotz v. Marotz*, 80 Wis.2d 477, 259 N.W.2d 524 (1977).

"It is a fundamental principle in this state that visitation privileges, like custodial rights, are created to promote the best interests of the child. *Neblett v. Neblett*, 274 Wis. 574, 571 [sic], 81 N.W.2d 61 (1957). As we stated in *Patrick v. Patrick*, 17 Wis.2d 434, 439, 117 N.W.2d 256, 259 (1962):

'Minor children are entitled to the love and companionship of both parents insofar as this is possible and consistent with their welfare.'

For this reason, visitation privileges granted to the non-custodial parent must not be viewed merely as a privilege of that parent, but as a right of the child which is not to be subverted by the custodian." 80 Wis.2d at 486, 259 N.W.2d at 529–30.

We believe that the theory that the non-custodial parent should have no legally enforceable right of visitation represents such a shift in policy in North Dakota that the question of whether or not it should be adopted should be left to the legislature.

■ Having determined that the district court did not arbitrarily disregard the opinion evidence of the expert witnesses, the question still remains whether the findings of the district court are clearly erroneous. In particular, Ingrid contends that the last half of the amended finding of fact number eight is clearly erroneous.

"8.

"That the Court finds that it would be in the best interests of the child to eliminate the periodic one-week visits as provided for in the Minnesota decree and that it would be in the best interest of the child to permit a visitation of six weeks at Defendant's home in International Falls, Minnesota, during the summer months."

It should be noted that the finding of the district court that it was in the best interests of Sophia to have extended visitation periods with her father was basically in accord with the determination of the Minnesota district court which initially accorded the visitation rights to Joseph. Furthermore, no evidence has been submitted even attempting to establish that Joseph is an unfit parent or that his conduct, or attitude, or the home environment which he provided for Sophia, contributed to the symptoms of regression described by Ingrid and her father. That being the state of the record, it is reasonably possible that the district court may have concluded that the symptoms were not wholly the result of the exercise of Joseph's visitation privileges.

■ As it is not our prerogative to sit as the trier of the facts, we examine these cases, when it is contended the trial court erred in its findings relating to visitation, merely to determine whether the findings are clearly erroneous. *See Filler v. Filler, supra* at 100, and Rule 52(a), N.D.R.Civ.P. In light of what we have said concerning the role of the trier of facts in determining the credibility of the witnesses and the weight to be given their testimony, and the evidence presented to the district court in this case, we conclude that the finding of the district court that it is in the best interests of Sophia to have a six-week visitation period with her father in the summer, is not clearly erroneous.

However, in light of the testimony of the experts to the effect that a forced separation from the custodial parent is, in itself, injurious to the child, irrespective of the conduct and attitude of the non-custodial parent, to lessen as much as possible that injury, the judgment should be modified to require that Joseph, prior to taking Sophia from Ingrid's home each summer, spend a week in the city of Ingrid's residence, during which time he shall attempt to gradually become reacquainted with his daughter under such reasonable circumstances and scheduling as Ingrid shall impose. This week adjustment period is to be included as a part of the six-week visitation period and is to be in effect until Sophia reaches the age of 14 or until otherwise ordered by the court. In this way, we hope to lessen the feeling of Sophia that she is being taken by a stranger to a strange home.

We note that the district court, in conjunction with the July 8, 1977, hearing, indicated that the adjustment should be made on a gradual basis, but did not incorporate such a requirement in the judgment. It is our view that such a requirement should have been incorporated in the judgment and we remand the case so that the judgment may be amended in light of what we have said herein.

Should the future clearly disclose that the six-week arrangement is lastingly detrimental to Sophia, Ingrid may, with proof thereof, reapply to the district court for modification of the judgment.

We remand for disposition consistent with this opinion. Costs shall be awarded to neither party.

SAND, PAULSON, PEDERSON, JJ., and JAMES H. O'KEEFE, District Judge, sitting in place of VOGEL, J., disqualified.