298 N.W.2d 493 (1980)
C.B.D., M.D.D., a minor child by his guardian ad litem Thomas Jensen, Director of Cass County Social Services Center, Plaintiffs and Appellees,
v.
W.E.B., Defendant and Appellant.
Civ. No. 9788.
Supreme Court of North Dakota.
October 28, 1980.
*495 Tenneson, Serkland, Lundberg, Erickson & Marcil, Fargo, for plaintiffs and appellees; argued by Ronald H. McLean, Fargo.
Chapman & Chapman, Bismarck, for defendant and appellant; argued by Daniel J. Chapman, Bismarck.
ERICKSTAD, Chief Justice.
The defendant, W.E.B. (hereinafter Walter), appeals from the judgment entered in Cass County District Court which found that he was the father of C.B.D.'s (hereinafter Cheryl) son, M.D.D. (hereinafter Matthew). The judgment required Walter to pay child support but denied him visitation rights. We affirm the judgment. Because this case was brought under Chapter 14-17, N.D.C.C. (Uniform Parentage Act), all names used herein are pseudonyms.
Cheryl began working for Walter in California in 1973 after she was graduated from the University of California Los Angeles (U.C.L.A.). A serious romantic relationship grew between the parties, even though Walter was married to someone else. The parties agreed to have a child together. This child, Matthew, was born March 3, 1976. Walter paid for Cheryl's medical expenses resulting from the conception of Matthew. When Matthew was born, Walter requested to be named the father on the birth certificate. Walter also paid support in the amount of $75.00 per week.
Walter's company had difficulties and quit doing business in 1976. At this time, Walter and Cheryl were starting law school together at the University of Southern California. Walter quit after a week and moved his wife and family to Fargo, North Dakota, while he began law school at the University of North Dakota in Grand Forks. He asked Cheryl to move to Grand Forks to live with him. Walter purchased a condominium in Grand Forks shortly after Matthew and Cheryl arrived. During this time, Walter resided weekdays in Grand Forks with Cheryl while going to school, and weekends in Fargo with his wife and family. Walter flunked out of law school and moved back to Fargo in January of 1977 where he began working as a realtor. In February, he arranged for an apartment across the hall from his mother's apartment for Cheryl and Matthew. During this time, Walter paid Cheryl about $600 per month for support.
In July, Walter told Cheryl he had left his wife. That night, their second child was conceived. That child is not a party to this action. Walter returned to his wife several days later. This action to determine paternity of Matthew and for child support was begun in July 1977. Walter continued support payments until November 1977.
During the negotiations in connection with this action, Walter had several attorneys who represented him. Pursuant to Section 14-17-09, N.D.C.C., a hearing was held before a referee in September 1978. After further negotiations, the trial was set for January 21, 1980. Notice was sent to Walter at his last known address which was in Texas. At this time, he had no attorney of record. Walter wrote to the trial judge and intimated that he could not afford an attorney. In response, the judge asked *496 Walter to send him a detailed listing of his assets and liabilities including his wife's assets and liabilities. In response, Walter sent the trial judge a letter in which he indicated that he could not afford to travel to Fargo or to hire an another attorney. He did not reveal his or his wife's assets and liabilities, nor object to being asked for a listing of either his or his wife's assets and liabilities. He did request that he be named the father of Matthew, that nominal child support be awarded Cheryl, and that he receive visitation rights.
Walter was not represented at trial. Cheryl was the only witness at trial. The court, sitting without a jury, found that Walter was the father of Matthew, that he should have no visitation rights, that he owed past support in the amount of $300 a month from December 1977 to January 1980, and that he should pay $200 a month child support thereafter until Matthew reached majority. The court also allowed Cheryl immediate possession of a $10,000 bond furnished by Walter in 1979. Walter raises five issues on appeal: (1) Was Walter entitled to an attorney under Section 14-17-18 of the North Dakota Century Code? (2) Was improper evidence admitted in the absence of any objection? (3) Was the court's award of support clearly erroneous? (4) Was it error to deny Walter visitation rights? (5) Was the court's order awarding immediate payment of the $10,000 bond in violation of Rule 62(a) of the North Dakota Rules of Civil Procedure?

I. RIGHT TO COURT APPOINTED COUNSEL
The crux of this appeal is the absence of Walter at the trial and that he had no counsel to represent him at the trial to safeguard his rights. Section 14-17-18, N.D.C.C., provides:
"1. At the pretrial hearing and in further proceedings, any party may be represented by counsel. The court shall appoint counsel for a party who is financially unable to obtain counsel." § 14-17-18(1), N.D.C.C.
There is nothing in the record to indicate that any request was made by Walter for court-appointed counsel. Walter's brief states that the request was in a letter addressed to the trial court which was admitted into evidence at the hearing as the court's exhibit No. 1. Court's exhibit No. 1, however, is a request by Walter addressed to the trial court dated January 16, 1980, that he, Walter, be named the father of Matthew, that he be required to pay nominal support, and that he receive visitation rights.
A letter to Walter from the trial court dated January 2, 1980, indicates that a letter was received by the court. In that letter the court said: "If your letter is to be considered as a request for the appointment of a lawyer, then this court needs a detailed listing of all your assets and debts in which [you] shall also include your wife's assets and debts." Walter did not send to the court any information regarding his financial position. His response dated January 16, 1980, was court's exhibit No. 1, which Walter's brief erroneously states was Walter's first letter to the court. In this letter, Walter states it is impossible for him to travel to Fargo or hire another attorney and requests certain action at the hearing. He requested: (1) that the court name him as the father of Matthew; (2) that he be allowed to visit Matthew; (3) that Cheryl be prohibited from interfering with his business; and (4) that nominal support be awarded [Cheryl for Matthew] as soon as he was able to support his family. The trial which Walter did not attend and at which he was not represented was held January 21, 1980.
Walter now asserts that counsel should have been appointed for him and that it was improper for the court to ask him to list his wife's assets and debts. On appeal, counsel for Walter asserts that all a party under the Uniform Parentage Act need do is assert that he is financially unable to obtain counsel and then the burden shifts to the court to either prove that the party has assets or appoint counsel for the party. Such an assertion is without merit. *497 Determination of financial inability is a question of fact. State v. Jensen, 241 N.W.2d 557, 561 (N.D.1976). (While Jensen refers to standards for appointment of counsel in a criminal case, not a civil case, it is a helpful reference for determination of appointment of counsel under the Uniform Parentage Act, as no more should be required under the latter than in a criminal case where one's personal freedom is at stake.)
Walter was asked to divulge his present financial status, but he failed to do so. This case had been before the court for two and a half years. In prior hearings, there was testimony received that Walter had income of $100,000 in 1971 and 1972, and $60,000 in 1973; that Walter had lived in a house which was sold for $260,000 in California; that he purchased an $85,000 house in Fargo for cash; and that during the same time period he purchased a condominium in Grand Forks. The court was also informed that Walter owned valuable possessions including a diamond ring, a Mercedes-Benz 450SEL, and a Steinway Grand Piano worth $25,000 to $30,000. Additionally, prior to Walter's request for appointment of counsel, the court learned that Walter had earned a real estate commission of $29,000 in 1979. The court was not required to ignore these facts regarding Walter's financial situation when determining whether or not to appoint counsel. Therefore, as those facts related to the past, it was not improper for the court to request a listing of Walter's assets and liabilities. Having failed to comply with the court's request, Walter cannot now complain about the lack of counsel.
Walter also contends that it was error for the court to require a listing of his wife's assets and liabilities in addition to his own. He relies on State v. Jensen, 241 N.W.2d 557 (N.D.1976), which contains an appendix regarding appointment of counsel in criminal cases. Paragraph four of this appendix states that in a criminal case, the initial determination for appointment of counsel shall be made without regard to family resources. In this case, however, Walter had been found to have transferred his interest in the family home in Fargo to his wife in violation of a temporary restraining order. Walter contended that it was his wife's money which had been used in purchasing the house, that his name was only listed as joint tenant, and that the transfer had no effect on his real assets. The court, however, determined otherwise and ordered him to either regain his interest in the home or post a $10,000 certificate of deposit with the clerk of court. Walter posted the $10,000 certificate of deposit. Under these circumstances, the court's request for financial information concerning Walter's wife was proper. Even the criminal standards set forth in State v. Jensen, supra, 241 N.W.2d at 561-62, require that "any information bearing on the defendant's financial status should be furnished by him." In an action under the Uniform Parentage Act, a party seeking appointment of counsel should be entitled to no more consideration than a defendant in a criminal case. When Walter declined to provide the requested information, he waived any right he may otherwise have had to appointment of counsel.

II. ADMISSIBILITY OF EVIDENCE
Walter also asserts that it was error for the court to admit evidence concerning an offer of settlement drafted by his attorney. While offers of compromise are generally not admissible to prove liability or amount of the claim, they are admissible if offered for another purpose. Rule 408, N.D.R.Ev. See also Schneidt v. Absey Motors, Inc., 248 N.W.2d 792, 797 (N.D. 1976). In this case, the court questioned the use of the offer of settlement as evidence. This was not required considering there was no objection to the evidence by the opposing party. Rule 103, N.D.R.Ev. Cheryl's counsel argued that the offer of settlement was merely cumulative evidence to show that Walter was a wealthy man. In Schuh v. Allery, 210 N.W.2d 96 (N.D. 1973), we said that, "a trial judge, in a nonjury case, should ordinarily admit all evidence which is not clearly inadmissible." *498 210 N.W.2d at 99. In that case, we quoted language from Builders Steel Co. v. Commissioner of Internal Revenue, 179 F.2d 377, 379 (8th Cir. 1950), stating:
"In the trial of a nonjury case, it is virtually impossible for a trial judge to commit reversible error by receiving incompetent evidence, whether objected to or not." 210 N.W.2d at 100.
In this case, paternity was admitted so there was no question as to liability. A great deal of evidence was introduced to show that Walter was a wealthy man. The offer of settlement was merely cumulative of this evidence. It was not reversible error for the court to receive such evidence.

III. AWARD OF SUPPORT PAYMENTS
Walter's third assertion is that the award of support was clearly erroneous. In State v. Unterseher, 255 N.W.2d 882 (N.D. 1977), we held that the applicable standard of review of an award of support under Section 14-17-14(5), N.D.C.C., was abuse of discretion. 255 N.W.2d at 891. In the later case of State of Or. ex rel. Krueger v. Krueger, 292 N.W.2d 60 (N.D.1980), we said:
"The district court's determination on the matter of child support is treated as a finding of fact and will not be set aside by this court on appeal unless it is clearly erroneous under Rule 52(a) of the North Dakota Rules of Civil Procedure." 292 N.W.2d at 61.
We conclude that we applied the correct standard of review in the latter case and thus that the award of support is a finding of fact and Rule 52(a), N.D.R.Civ.P., is applicable. Therefore, the proper standard of review is whether or not the finding is clearly erroneous.
"A finding is `clearly erroneous' only when, although there is some evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been made. United States v. United States Gypsum Co., 333 U.S. 364, 68 S.Ct. 525, 92 L.Ed. 746 (1948)." In re Estate of Elmer, 210 N.W.2d 815, 820 (N.D.1973).
Section 14-17-14(5), N.D.C.C., provides:
"5. In determining the amount to be paid by a parent for support of the child and the period during which the duty of support is owed, a court enforcing the obligation of support shall consider all relevant facts, including:
a. The needs of the child;
b. The standard of living and circumstances of the parents;
c. The relative financial means of the parents;
d. The earning ability of the parents;
e. The need and capacity of the child for education, including higher education;
f. The age of the child;
g. The financial resources and the earning ability of the child;
h. The responsibility of the parents for the support of others; and
i. The value of services contributed by the custodial parent."
In this case, the trial court had before it a great deal of evidence indicating Walter was a wealthy man. Including the evidence previously listed in section I., evidence was received that Walter had previously supported Cheryl by paying her $600 per month, that he had shortly before gone on a vacation trip to Africa, and that he had income of $100,000 in the years 1971 and 1972. The only evidence indicating that Walter could not afford child support was his own letter to the court. Under these circumstances, it was not clearly erroneous for the court to award child support in the amount of $300 per month preceding the trial and $200 per month thereafter.

IV. DENIAL OF VISITATION RIGHTS
Walter asserts that there was not sufficient evidence to support the court's denial of visitation rights to him. As in custodial cases, the question of visitation should be resolved to promote the best interests of the child. Gardebring v. Rizzo, 269 N.W.2d 104 (N.D.1978). In his brief, *499 Walter asserts that the only evidence introduced at trial on this issue was the "self-serving" declarations of Cheryl.
This court's role is not to act as a trier of facts. Rather, it is to review the trial court's findings regarding visitation and determine whether or not such findings are clearly erroneous. Gardebring v. Rizzo, supra, 269 N.W.2d at 111.
The evidence in the record is that Walter had no contact with Matthew in two and one-half years. Cheryl is now married to a man who has accepted Matthew and his sister into his home to raise as his own children. Additionally, Walter has vacillated between admitting and denying paternity of Matthew. The trial court's finding is as follows:
"It appears from the records that [Walter] has had no contact with this child since abut the time that he was born and was a very young child, I believe it was 1977, the last time. A lot of expense and litigation was necessary to establish that he was the father. We are now into his fourth, almost his fourth birthday and it would appear that if [Walter] had any paternal ambitions or paternal instincts, he would have made contact with this child long before this in view of the fact that there was very little doubt that he was the father. The testimony of [Cheryl] is that it would not be in the best interest of the child to allow visitation rights under these circumstances because of the fact that the child has [had] no community [communication] whatsoever with his father. There's been no contact made between [Walter] and the child since 1977. He has in fact denied that he was the father. He's made no support toward the child since about 1977. In view of the fact of the impending marriage of [Cheryl] and the possibility of adoption by her husband in view of the fact that this would establish a home for the child [Matthew], and for his sister..., this Court finds that it would be in the best interest of this child, [Matthew], that no visitation rights be given [Walter]. Now the Court does this reluctantly because I never want to be a Judge that denies the right of a parent to visit his children or her children but under the facts in this case and the fact that [Walter] did not appear in court to defend his rights, he's in default, I have nothing affirmatively showing it would be in the best interest of the children to allow visitation. All his past conduct has indicated that it would not be in the best interest of the child. And so following the law which is set out in 15 ALR 3rd beginning at page 887, this Court in its discretion and based on the preponderance of evidence and based on the major premise that the best interest of the child is to be considered, no visitation rights shall be given [Walter]."
A parent has a basic fundamental right to his children, but this right is not absolute. Keator v. Keator, 276 N.W.2d 135, 138 (N.D.1979). We agree with the trial court that denial of visitation rights, even to the father of an illegitimate child, should only be done reluctantly. Denial of visitation rights should be an exception and not the rule, and the exception should be only when it is in the best interests of the child. Under the circumstances of this case, however, we cannot say that the trial court's denial of visitation rights to Walter was clearly erroneous. Had the father originally and consistently admitted paternity, kept in contact with the child, supported the child financially and otherwise, the trial court may very possibly have permitted visitation, but such is not the case here.

V. VIOLATION OF RULE 62(a)
Walter's final assertion is that the immediate payment of the $10,000 certificate of deposit (which had been filed with the clerk of court pursuant to the court's order) to Cheryl for attorney's fees and child support in arrears violated Rule 62(a) of the North Dakota Rules of Civil Procedure. We agree. Rule 62(a) states that "no execution shall issue upon a judgment nor shall proceedings be taken for its enforcement until the expiration of 10 days after its entry." In this case, the bond had been posted to prevent prejudicing Cheryl's *500 rights when Walter transferred his interest in the family home to his wife contrary to a temporary restraining order. All other substantive points of Walter's appeal have been affirmed. The immediate disbursal of the funds to Cheryl was improper, but it did not affect any substantial rights of Walter. Aron v. Snyder, 196 F.2d 38, 40 (D.D.Cir. 1952). Therefore, such action was harmless error and is not a proper basis for modifying the judgment. Rule 61, N.D.R.Civ.P.
We are not unmindful of our recent decision of Beck v. Smith, 296 N.W.2d 886 (N.D.1980). In Beck, we continued a stay of an ex parte order until a 10-day notice was given of the filing of a foreign judgment under Section 28-20.1-03(2), N.D.C.C., of the Uniform Enforcement of Foreign Judgments Act. Beck involved an ex parte order to enforce a foreign custody decree. Failure to give notice was not harmless in Beck as the order was issued ex parte, thus denying the party against whom it was issued an opportunity to appear and stay enforcement of the foreign custody decree or to seek modification of the decree. Appellate relief from an ex parte order generally is not available unless the party requests the trial court to set it aside and such request is denied. Thus it is imperative that the party be given sufficient notice in order to be able to make that request. In the present case, Walter was given the opportunity to appear at the trial prior to entry of any judgment. He voluntarily chose not to appear. The immediate execution on the bond did not prejudice any of Walter's rights. He has been able to appeal the judgment and we have affirmed all substantive portions of that judgment. Therefore, unlike Beck, failure to stay the execution of judgment on the $10,000 certificate of deposit was harmless error.
The judgment of the trial court is affirmed.
SAND, PAULSON and VANDE WALLE, JJ., concur.
PEDERSON, Justice, concurring specially.
I agree with the results reached by the majority.
Once more I am compelled to express my view about Rule 52(a), NDRCivP. See, e. g., my special concurrence in Schmidt v. Plains Electric, 281 N.W.2d 794 (N.D.1979), and dissent in Vetter v. Vetter, 267 N.W.2d 790 (N.D.1978).
When I read a finding of fact, such as the one quoted by the Chief Justice in part IV of the majority opinion, I am convinced that there was no tentative understanding before the trial began of a list of the issues of fact and, separately, issues of law to be tried. It is no wonder that trial courts feel overburdened by the need to fully comply with Rule 52(a). Likewise, it is no wonder that the losing party at trial will appeal because he has no clear understanding of the basis of the trial court's decision and, consequently, a burgeoning appellate load on this court.
We should not be compelled to overlook inadequate findings merely because we prefer to reach the merits of all appeals, and because it is often an extravagant waste of judicial effort to remand for more adequate findings.