Ann C. JORDANA, Petitioner-Appellant,

v.

Edwin B. CORLEY, Respondent-Appellee.

Civ. No. 8995.

Supreme Court of North Dakota.

June 27, 1974.

McGee, Hankla, Backes & Wheeler, Minot, for petitioner-appellant.

Bosard, McCutcheon, Kerian, Schmidt & Holum, Minot, for respondent-appellee.

ERICKSTAD, Chief Justice.

This is an appeal from an order of the District Court of Ward County awarding custody of Gary and Eddie Corley to their father, Edwin B. Corley. By a divorce decree granted in the Common Pleas Court of Clark County, Ohio, on May 20, 1968, the mother of the children, Ann C. Jordana, formerly Corley, had previously been awarded custody.

Ann and Edwin were married in Cambridge, England, on August 29, 1959. At that time Edwin was an enlisted man in the United States Air Force. Ann was and is an English citizen. Two children were born of that marriage: Gary Carl Corley, on February 20, 1960, while the parties were still in England; and Eddie DeWayne Corley, on August 4, 1962, when the parties were residing in the United States.

Gary was eight years old and Eddie was five years old at the time of the divorce. Although custody of the children was given to Ann, visitation rights were given to Edwin. He was to be permitted to visit each week from one p. m. on Saturday un-

til five p. m. on Sunday, in addition to a two-week vacation period each summer.

On November 18, 1968, Ann married Captain Modesto Jordana, an Air Force officer. One child, Richard, age two and a half years at the time of Ann's motion in Ward County District Court, had been born of this marriage. Richard's custody is not before this court. In December 1968, Edwin married Shirley Stewart, who had three children by a former marriage, ages thirteen, eleven, and eight in 1973 when this matter was heard. No children had been born of this latter union at that time.

Ann left with Captain Jordana and her children, Gary and Eddie, for Itasuki Air Force Base in Japan shortly after their marriage in November of 1968. They remained in Japan until November 1, 1969, at which time they moved with Captain Jordana to Manila, Philippines, where they remained until July of 1972. In July 1972 Captain Jordana was assigned to the Minot Air Force Base, Minot, North Dakota. Ann and the children did not accompany him to North Dakota; instead, they moved to Cambridge, England, where they visited with Ann's parents for some nine months. In April 1973 they joined Captain Jordana in Minot. In July of 1973 the children, Gary and Eddie, were allowed to fly to Missouri to visit their father, who was residing on a farm on the outskirts of Jefferson City.

During the nearly five-year period from November 1968 to April 1973, Edwin was unaware of the whereabouts of Gary and Eddie. The trial court found that Ann did not keep Edwin informed of her address and that during this time Edwin actively sought to ascertain the whereabouts of his former wife and his children through political and Air Force channels, to no avail.

When the children went to Missouri to visit their father, he refused to return them and instead filed a petition with the Circuit Court, Cole County, Missouri, seeking their custody. In response thereto Ann

filed a motion with the District Court of Ward County, North Dakota, asking for an order requiring Edwin to return the children to her in North Dakota. The district court of Ward County then ordered Edwin to appear in court in Ward County with the children.

Before a hearing could be held in Missouri on Edwin's petition and without waiting for him to appear in court in North Dakota with the children, Ann surreptitiously removed the boys from Missouri and returned them to North Dakota under an assumed name.

On September 25, 1973, after due hearing, the district court of Ward County awarded custody of the children to their father.

The trial court found that the best interests of the children would be served by awarding the custody of the children to Edwin. The issue is whether that finding is clearly erroneous.

██ In Ferguson v. Ferguson, 202 N. W.2d 760 (N.D.1972), at 761, in paragraph 3 of the Syllabus, we held:

"Findings that a party to a divorce action has committed adultery, *that the best interests of the children of the parties to a divorce action would be served by awarding custody of the children to one party as opposed to the other,* and that a particular division of property between the parties to a divorce action is equitable, are appropriately dealt with on appeal as findings of fact. Consequently, a review of these findings *is limited to a determination of whether or not they are 'clearly erroneous' within the purview of Rule 52(a), N.D.R.Civ.P."* [Emphasis added.]

This approach was reaffirmed in Silseth v. Levang, 214 N.W.2d 361 (N.D.1974), at 362, paragraph 5 of the Syllabus.

Let us review the evidence in light of that rule.

It was established at the hearing that Edwin and his second wife, Shirley, were married December 5, 1968; that Shirley had three children, all girls, by a former marriage; that they live on a five-acre plot about nine miles from Jefferson City, Missouri; that Shirley is employed as a supervisor at a Jefferson City Westinghouse plant, with a net take-home salary of $630 a month; that Edwin manages and owns a service station and tire distribution center, in addition to leasing additional land on which he raises about fifty-eight head of cattle and some chickens; that Edwin's average income is approximately $9,000 per year; that the home in which they live is a brick building with three bedrooms and a full basement, valued at $28,000, encumbered with a $16,000 mortgage; that Shirley welcomes the boys into her home; that according to Shirley, Edwin has been a good father to her girls and Shirley believes that she could be a good mother to the boys.

The testimony tended to show that the boys lived a different life in Missouri with Edwin than in North Dakota with Ann. The trial judge thought those differences significant. While in Missouri, the boys were given the responsibility of seeing that certain chores around the farm and at Edwin's business were performed. For instance, Gary learned how to mount and dismount tires and assisted in cleaning Edwin's place of business. The boys also fed the cattle and chickens. The trial judge viewed the work and the responsibility favorably.

Edwin testified that when the boys arrived in Missouri, their language, behavior, and general mannerisms showed a disrespectful if not belligerent attitude towards others, and that their language and attitude showed an improvement after staying with him.

When Edwin refused to return the boys to North Dakota, Ann did everything she possibly could to get the boys back. As previously mentioned, she eventually returned the boys to North Dakota under an assumed name, after removing them from school in Missouri. Prior to taking the children, Ann wrote numerous letters to Edwin and called numerous times, making various threats and accusations. In one letter she suggested that Edwin come to North Dakota to stay with her so they could work things out and that Captain Jordana need not know about the proposed visit. She also asked about the Missouri divorce laws, stating she wished to get a divorce from Captain Jordana. It is with this background that the trial judge noted an argument between Edwin and Shirley in which a cup was broken on the kitchen floor. Shirley testified she apologized to the boys for the incident.

At the time of trial, Ann was separated from Captain Jordana and although neither party had yet filed for a divorce, their marriage was unsettled at best. Captain Jordana did not testify at the trial and no reason was given for his failure to do so. Ann was living at that time apart from Captain Jordana in a twelve-room house on which he was making the payments. She was employed as a salesclerk at a women's apparel shop, working six and one-half hours per day, five days a week, with a net income of approximately $95 every two weeks.

Evidence of her conduct and moral character was presented without objection. It indicated that Captain Jordana filed a complaint against her for occupying a motel room with another man, and that a warrant for her arrest was issued on or about one a. m., July 15, 1973. Ann was arrested in a motel room in the presence of a man Captain Jordana called her "lover". Captain Jordana later dropped the charges.

During the hearing in Ward County the trial judge took each boy into his chambers out of the presence of counsel, the parties, and other witnesses, and questioned them as to parental preference. Both boys indicated they wished to remain with their mother. Evidence was also presented

which indicated that Ann had told the boys she would commit suicide if she was not awarded their custody. The trial judge considered the preference expressed by the boys, but concluded the suicide threat was such a strong influence that he could not give much weight to the preference.

The trial judge was favorably impressed by the home Edwin had provided and could provide for the boys, although he had reservations about his marriage. The alternative as the trial judge saw it was Ann's unsettled marriage, her home which lacked discipline the natural father could give, and Ann's questionable moral conduct arising from the motel incident.

Pertinent findings of fact of the trial court follow:

"9. At the trial in the above action before this Court on the 25th of September, 1973, the present wife of Edwin B. Corley appeared as a witness to testify that the two boys, Gary and Eddie, were welcome in their home, and she gave a good account of the care the children received while they were with them for the months of July and August. Captain Jordana did not appear as a witness.

"10. The evidence disclosed that Captain Jordana signed a complaint against his wife, Ann Jordana, on the first of July, 1973, in Police Court, Minot, North Dakota, to charge her with occupying a motel room with a Robert Bauer. The police records introduced into evidence show that Captain Jordana told the Police Department that she was occupying a room at a motel with her 'lover.' The arrest was made at about 1:30 a. m. at the motel. Thereafter on July 16, 1973, the action was dismissed at the request of Modesto Jordana. The evidence indicates that Captain Jordana and his wife are separated, and he intends to commence an action of divorce against her. While they were living together, the Court finds that Captain Jordana was a good stepfather to the two boys.

"11. The two children, Gary and Eddie, both testified at the request of Counsel for Mr. Corley. Although both of the boys indicated they would rather live with their mother, the Court finds that their reasons can be partly based upon the conduct and influence of the mother. The mother, for instance, told the oldest son that she was considering suicide if she lost custody of the two boys. The Court also finds that the oldest boy would rather be with the mother because of the fact that he would be doing chores and working harder if returned to his father. The Court finds that the two boys were getting along quite well at their father's home in Missouri until the mother brought them back to North Dakota.

"12. The Court finds that the two boys are at an age where they need the discipline and care of their natural father, especially in view of the unsettled condition of their mother's second marriage and the apparent break-up of that marriage, and her moral conduct as set forth above.

"13. While the children were with the father in the summer of 1973, Mrs. Jordana wrote her former husband a letter, to-wit, Exhibit B, and insinuated therein that perhaps they could get back together again, and she suggested that he come to Minot, without her present husband knowing about it, for a visit.

\* \* \* \* \* \*

"16. The Court finds that there was a quarrel between Edwin B. Corley and his present wife while he had custody of the children for visitation purposes, but the Court finds that this was the result of the letter and phone call made by Ann C. Jordana to Mr. Corley, which disturbed Mr. Corley's present wife. Nevertheless, the Court believes that it will be for the best interests of the children that a social worker in Cole County, Missouri, make regular visitations to the home of Mr. and Mrs.

Edwin B. Corley. In view of the fact that the two boys will be living with three step-sisters, counseling may be beneficial."

Ann asserts that the trial court found her to be a good mother to the boys while they were in her care and custody; that there was no showing she is now an unfit mother; that it is improper for the court to base its decision upon a criminal charge which was dismissed and upon an erroneous impression that her marriage is unsettled, gained from a petition that was filed in Family Court by Captain Jordana, seeking marriage counseling in an effort to preserve the marriage.

In reviewing the record with regard to the motel incident, we find that Ann was questioned on cross-examination without objection as to the incident. She explained the incident, saying she was merely visiting a friend and that she often visits friends in motels. Lieutenant Warren Larsen, Records Officer for the Minot Police Department, was called by Edwin to testify about the incident. Lieutenant Larsen laid the foundation for the introduction into evidence of the arrest record concerning the motel incident. Again, this evidence was received without objection. In the arrest record was an identification and showup sheet which contained a detailed account of the alleged offense. Ann was found "visiting" with a man in a motel at approximately 1:45 a. m. When the policeman knocked at the door a man answered and at first said he was alone, but later he said, "Ann, if you are decent come on out." The man and Ann were taken to the police station, but the charge was later dismissed. Ann's marital status was listed in the arrest record as "separated".

Ann maintains that there is little probative value to a criminal charge which was later dismissed and that it cannot justify the trial judge's decision to change custody.

This court recently held, in Ficek v. Ficek, 186 N.W.2d 437 (N.D.1971), that even admitted adultery of the wife on one occasion did not preclude an award of custody of girls of tender age to her where the evidence indicated that in other respects she was a good mother and the children were always clean and well cared for.

The situation at bar is materially different from *Ficek*. In this case there is no admitted adultery, and we are dealing with boys coming into adolescence, not girls of tender years.

We believe that while this motel incident standing alone would not be sufficient reason for changing custody of the children, the fact that the trial judge may have considered it along with other facts does not make his finding clearly erroneous. The trial judge had the responsibility of determining the credibility of the witnesses and weighing the evidence. The fact that he performed this function and considered evidence introduced without objection as one of several factors in arriving at his decision does not make the decision clearly erroneous. The trial judge was obviously impressed with the opportunities the father's home provided the boys to learn good work habits within a family atmosphere, where the income was sufficient to care for all needs, and the father was present not only to discipline and teach but also to set an example. That a loving father's presence in a home of boys of this age is valuable is an accepted fact of life.

Since the boys were at the time of the trial eleven and thirteen years of age, the latter part of Section 30–10–06(2), N. D.C.C., comes into play. That part specifies that if the child "is of an age to require education and preparation for labor or business, then [custody should be given] to the father." The trial court had the responsibility of taking that statute into consideration. In light of circumstances in which their preferences were stated, we believe that the trial court was wise in giving priority, over their expressed preferences, to their training and education.

■ The main thrust of Ann's second contention is that the trial judge erroneously considered the petition filed in Family Court by Captain Jordana as evidence of their marital difficulties and that this filing influenced the judge to change the custody of the children. Ann argues that if the judge is allowed to use such evidence in custody disputes to establish marital difficulties, it will discourage the use of Family Court and frustrate its ultimate purpose.

Significant as such a contention might be in some cases, it is not here, as the petition filed in Family Court was not the only evidence of Ann's marital difficulties. There are several instances in the record which independently establish that Ann and Captain Jordana were having marital difficulties; i. e., the testimony of Ann herself; a letter she wrote to Edwin in which she inquired about Missouri divorce laws and in which she said: "I know I jumped into this second marriage too soon" (Exhibit B, p. 1); and the police arrest record which was introduced into evidence. Whether Ann's argument would have merit if no independent evidence of marital difficulties existed other than the mere filing of a petition in Family Court is a question we need not decide today.

■ Ann raised a third point in oral argument that was not mentioned in the brief, that of whether the trial judge may have erroneously let his own feelings about his childhood home interfere with his decision. We find no evidence that the trial judge based his decision in this case upon his own personal experiences to the exclusion of the evidence presented. What we find is a concerned trial judge in the privacy of his chambers attempting to demonstrate to two young boys that he understood what they were experiencing, sympathized with them, and wanted to do what was best for them. He is to be commended for his efforts.

■ Although the boys expressed a preference to remain with their mother, the trial judge gave little weight to such preference because he believed it was due to the fear that their mother would carry out her threat of suicide. Important as such a preference may be when freely made, it is not even then controlling, but is only one factor to be considered. Here it was not freely given. The controlling considerations are the best interests and the welfare of the children. See Guldeman v. Heller, 151 N.W.2d 436 (N.D.1967).

Although *Guldeman* was decided prior to our adoption of the Clearly Erroneous Rule, the factors therein said to be important in determining custody are still the factors to be considered.

■ We are satisfied that the trial judge considered those factors in making the custody decision in this case and that his decision is not clearly erroneous. N. D.R.Civ.P., Rule 52(a). In *Guldeman,* we said:

> "5. When, after a divorce and determination of custody has been made, a change of custody is sought by the party to whom custody has been denied, a decision again must be made on the basis of what is best for the child. The fundamental factors for consideration in determining that question are the attitude of the parties towards the child since the divorce, the age of the child, the ages of the parents, the preference of the child as to which parent he desires to live with, the occupations of the parents, the stability of the home, the morals of the parents, and any other matters that bear upon the welfare of the child." Guldeman v. Heller, *supra,* Syllabus ¶ 5, 151 N.W.2d 436 at 437, 438.

See also Goff v. Goff, 211 N.W.2d 850 (N.D.1973).

In Silseth v. Levang, *supra,* we stated:

> "It is not in the best interests of a child to *unnecessarily* change custody and bandy the child back and forth between parents. Stability is desirable."

Silseth v. Levang, *supra,* Syllabus ¶ 4, 214 N.W.2d 361 at 362.

We adhere to that principle even though affirming the result in this case works a change in custody. While a court should not make unnecessary custody changes, that is not to say custody changes should never be made. Here, we believe that in considering all the factors the court made the right decision. In any case, the decision to award custody to the father was not clearly erroneous.

Factors other than those stated in *Guldeman* may be important—witness the approach to child placement expressed in *Beyond the Best Interests of the Child,* Goldstein, Freud, Solnit (The Free Press: New York 1973). The authors' goal of using "each child's placement as an occasion for protecting future generations of children by increasing the number of adults-to-be who are likely to be adequate parents" is a laudable goal we can all agree upon. The means suggested by the authors of reaching this goal contain many ideas which may be applied within the existing framework of law and many which represent such a shift in policy that they are better left to the Legislature. Hopefully, the trial judge here has taken action best suited to reaching that goal.

 Lest it be asserted that we have ignored the fact that Edwin was in default on child-support payments from December 1968 when Ann remarried and left the country until August 1973 in the approximate amount of $5,000 and that he therefore was not entitled to our consideration on his motion, we think it sufficient to say that we believe it was proper to consider this fact in light of the fact that Ann had failed to keep him informed of her address and thus had made it impossible for him to exercise his visitation rights. See Filler v. Filler, 219 N.W.2d 96, Syllabus ¶ 1 (N.D.1974), where we held:

"1. The Clean Hands doctrine is not an absolute bar to favorable action on a motion by a party in a divorce case who is delinquent under prior orders of the court. The court has discretion to act on such a motion, particularly in custody matters, where the interests of children of the parties are paramount."

It should also be noted that Edwin has been ordered to pay the full amount of the back-support.

We conclude that the trial court's finding that the best interests of the children are to be served by placing their custody in their natural father is not clearly erroneous. The judgment of the trial court is therefore affirmed.

PAULSON, J., concurs.

TEIGEN, J., concurs in result.

KNUDSON, J., deeming himself disqualified did not participate.

VOGEL, Judge (concurring specially).

I concur in the result. I believe that the lower court made a mistake in transferring the custody of the children from one party to the other, but I am not sufficiently positive of the correctness of my belief to say that the decision is clearly erroneous.

The remarks which follow are intended as provisional hypotheses, tentative approaches toward a philosophy of custody in difficult cases. They are not intended to be critical of the trial court and the majority opinion, which apply the usual standards in such cases.

We should not be so much interested in the fitness of the parents as such, but ". . . who is the child used to, fond of, connected with by daily experiences, related to through memories, learning from through identification? Whom is he used to coming to with his questions, finding at home when he gets there, being tucked in by at night and trying to act like? Who

gives him his bottle, eventually teaches him how to make a sandwich or throw a ball, who reads to him, whom does he wind up wanting to 'be good' for so they'll go on loving him?" [Quoted from a review of Freud, Goldstein, and Solnit, "Beyond the Best Interests of the Child" (The Free Press, 1973), in the New York Times Magazine, October 7, 1973.]

In this case, that person very likely was the mother.

The book just quoted makes the further point that any change of custody is an uprooting, which can be expected to be damaging, and which therefore should be avoided except in extreme cases. Here, a visit which was to be temporary was prolonged by the unilateral decision of the father, a disruptive tactic. The action of the mother in retaking possession of the children, although justified by existing court custody orders, was likewise unsettling, and the ultimate decision of the trial court caused another uprooting. The effect could hardly be other than traumatic. Both parents have contributed to the trauma, and so has the court. For a full discussion of the concept of "separation trauma" see In re Adoption of Tachick, 60 Wis.2d 540, 210 N.W.2d 865 (1973).

As the Supreme Court of Iowa wisely says:

". . . the status of children should be quickly fixed and, thereafter, little disturbed." Jacobs v. Jacobs, Iowa, 216 N.W.2d 312 (1974).

This is a case where the children would have benefited from having their own lawyer. They may be victimized by the animosities of their parents. Parents who love their children, but actively dislike each other, cannot be expected to be dispassionate about the children's welfare in the midst of confrontations with each other.

I do not believe it is beneficial for courts to ask children what their preferences are as to custody. Of course, courts cannot prevent (except by persuasion) the parties from calling the children as witnesses. If the parties insist, I agree that it is better for the court to make inquiries in chambers, preferably in the presence of counsel. I take it that the commendation of the trial court in the majority opinion refers to this procedure, and not to the practice of asking the children for their preferences. It would be better, I believe, to leave the children out of the matter entirely. In the first place, it must create a feeling of guilt in any child to have to disappoint one of two parents he loves by expressing a preference for the other. Psychological problems can be expected whether the child makes the choice or refuses to do so. In the second place, if the child knows (and he usually does) that placements are not final and that he may be asked in the future to express a preference, he may consciously or unconsciously use that knowledge to extort favors from one or both parents—not a cheerful harbinger of a normal relationship with either parent.

I regret the continued vitality of the idea that children of tender years belong with the mother and older children with the father. This is a relic of the days when child labor was an economic asset and children learned their trades from cottage labor. Those days are gone. The concept, as expressed in our statute, Section 30–10–06, subdivision 2, N.D.C.C., may even be unconstitutional, as held in State ex rel. Watts v. Watts, Family Court, City of New York, 77 Misc.2d 178, 350 N.Y.S.2d 285 (1973), under the suspect criterion of discrimination by reason of sex. See Frontiero v. Richardson, 411 U.S. 677, 93 S.Ct. 1764, 36 L.Ed.2d 583 (1973), and Reed v. Reed, 404 U.S. 71, 92 S.Ct. 251, 30 L.Ed.2d 225 (1971). Seemingly contra, Arends v. Arends, 30 Utah 2d 328, 517 P.2d 1019 (1974).

I also express a doubt as to whether there was an adequate showing of a change in circumstances sufficient to justify a change of custody in this case.

In summary, this is a case where there is no right answer, only a plethora of wrong ones. I have the feeling, but not the conviction, that the trial court would have done better to leave the children with the mother, rather than uproot them again and turn them over to the father. But I cannot say the decision was clearly erroneous. I hope it is not erroneous at all, but I fear it may be.