Jenny MANSUKHANI, Plaintiff
and Appellee,

v.

Donald and Jean PAILING, Defendants
and Appellants,

Sandy Pailing, Jane Doe, and Richard
Roe, Defendants.

Civ. No. 10088.

Supreme Court of North Dakota.

April 21, 1982.

Mills & Moore, Bismarck, for plaintiff and appellee; argued by Sherry Mills Moore, Bismarck.

Chapman & Chapman, Bismarck, for defendants and appellants; argued by Daniel J. Chapman, Bismarck.

ERICKSTAD, Chief Justice.

This is an appeal by Donald and Jean Pailing, the grandparents of Jennifer and Allen Pailing, from a judgment of the District Court of Burleigh County, dated September 18, 1981, placing custody of Jennifer and Allen with their mother, Jenny Mansukhani. We reverse and remand with instructions to the district court for entry of judgment placing custody of Jennifer and Allen with Donald and Jean and awarding visitations to Jenny with the children in

accordance with the restrictions and limitations set forth in this opinion.

James Pailing, Donald and Jean's son, married Jenny on June 7, 1974. At that time Jenny, who was 18 years old, had just been graduated from Drake High School, and James, who was approximately five years older than Jenny, was living in Butte. James and Jenny moved to Minot where they lived until they separated in January, 1976. By their marriage James and Jenny had a daughter, Jennifer, born November 12, 1974, and a son, Allen, born August 1, 1976.

In its findings the district court states, "The marriage was always in trouble." The court concluded that James was not a good provider; exemplified by the fact that during the one and one-half years James and Jenny lived together James held ten jobs none at which he remained employed longer than one and one-half months. The court also determined that James was a heavy drinker of alcoholic beverages and that he would be absent from the home for periods, sometimes for as long as one week, without explanation. While James and Jenny were married and residing together, Donald and Jean assisted them by bringing groceries and by purchasing a used mobile home for their use.

When James and Jenny separated during January, 1976, Jenny moved with Jennifer to Drake where Jenny's parents resided. During August of that year, Allen was born and Jenny was then faced with the burdensome task of caring for two young children. During December, 1976, Jenny asked her mother to transport Jennifer and Allen to reside with James, who was at that time unemployed and living with Donald and Jean at Butte. Jenny testified that she made that decision because she was unemployed and had no money. She also testified that she knew Donald and Jean, with whom James was residing, would be able to provide the children with food, clothes, and Christmas gifts. The district court found that Jenny intended to take Jennifer and Allen back upon securing a good job which would allow her to support herself and the children.

During the early part of 1977, James and Jenny lived together in Minot for about six weeks in an attempt to reconcile their marriage. Jenny testified that she went back to James because she felt she had made a mistake in leaving the children with him and she wanted her children back. Jenny testified that during this reconciliation period James promised her he would take the children from their grandparents, who were caring for them at their home in Butte, and bring them to Minot. He never did, and there is testimony that Donald and Jean advised him against taking the children to Minot because they did not believe James and Jenny had adequate facilities there to care for the children.

James and Jenny separated again during March, 1977, and were divorced during October of that year. Based upon a settlement agreement between James and Jenny, the divorce decree provided that James would have custody of Jennifer and Allen with reasonable visitation rights for Jenny including the right to take the children for overnight and weekend visitations.

Subsequent to the divorce James and the two children continued to live with Donald, Jean, and the children's aunt, Sandy Pailing. James died as a result of an automobile accident on July 22, 1980, and it is undisputed that prior to his death he provided relatively minimal care and support for the children. There is also no dispute that from December, 1976, to the present time Jennifer and Allen have resided in their grandparents' home and from them have received their primary care and support. In its findings the district court concluded that even though James had legal custody pursuant to the divorce decree, "the feeding, dressing and caring of the children were primarily with the Defendant's [Donald and Jean]. James contributed very little financially toward the support of the children." During 1980, Donald and Jean sold the grocery store and cafe they operated in Butte and moved to Bismarck where Donald accepted a position as manager of the VFW Club. Jean works in the gaming room of the club about two days per week.

Jenny was remarried on December 12, 1977, to James Mansukhani. They lived in Surrey, which is located approximately six miles from Minot where James is employed as an oven operator with Sweetheart Bakery and where Jenny has been employed as a barmaid, hostess, and waitress in various establishments. They have two daughters as a result of their marriage: Maya, born January 7, 1979, and Sharmila, born April 5, 1981. Although the district court found that Jenny on one occasion had sexual relations with a male acquaintance during 1980 while married to James Mansukhani, the court concluded that "this isolated single transgression has not broken or affected her present marriage relationship." Nevertheless, there was testimony by more than one witness that Jenny had expressed a desire to get a divorce from James Mansukhani, that she had stayed in two different apartments in Minot at various times during her second marriage, and that she, on more than one occasion, had been kissing and caressing or had been otherwise intimate with men other than her husband.

Jenny testified that Donald and Jean did not cooperate with her attempts to visit the children and that they were instrumental in preventing her from exercising overnight visitations with the children. To the contrary, Donald and Jean testified that they did not attempt to prevent Jenny's visitations with the children, but that Jenny was not allowed to take the children on overnight visitations on various occasions either because the children had been sick or because the children became upset, to the point of becoming hysterical, when the time came for them to leave with Jenny for the visitations.

The district court found that during the time the children have resided with Donald and Jean, Jenny has had approximately the following number of visitations with the children: one visit on Christmas Day in 1976 approximately two weeks after the children commenced living in the grandparents' home; ten visits in 1977; six visits in 1978; two visits in 1979; and a total of five visits in 1980 all of which occurred during the month of August. The district court

concurred with Jenny's assertion that her visitations with the children became less frequent because each visit was emotional and upsetting to her and the children. The district court found that the tense atmosphere during Jenny's visits with the children created nervous anxieties for Jenny which her doctor advised her to avoid during her pregnancies with Maya and Sharmila because she already had experienced one miscarriage during her marriage to James Mansukhani. The district court also found that subsequent to August, 1980, during which time custody proceedings have been pending in the courts, Jenny has only been allowed visitations under limited conditions within the sole discretion of the grandparents.

Subsequent to James Pailing's death in July, 1980, Jenny requested Donald and Jean to return Jennifer and Allen to her. Donald and Jean refused Jenny's request, and Jenny then filed a petition for a writ of habeas corpus seeking custody of the children through the courts. The district court entered a judgment awarding Jenny custody of the children from which Donald and Jean appealed, and in *Mansukhani v. Pailing*, 300 N.W.2d 847 (N.D.1980), *cert. den.*, —— U.S. ——, 102 S.Ct. 98, 70 L.Ed.2d 88 (1981), this Court vacated the judgment and remanded the case to the district court for an evidentiary hearing on the custody issue. The district court, another judge sitting, subsequent to the evidentiary hearing, entered a judgment awarding Jenny custody of the children from which Donald and Jean have filed this appeal.

This court has recognized that parents have a right to the custody and companionship of their children superior to that of any other person and that, although such right is not absolute, the courts are reluctant to remove a child from the parent's custody unless it is necessary to prevent serious detriment to the welfare of the child. *Hust v. Hust*, 295 N.W.2d 316 (N.D.1980); *In Interest of M. M. C.*, 277 N.W.2d 281 (N.D. 1979). In *Hust, supra*, this Court, recognizing that the determinative standard for awarding custody in a divorce action is "the

best interests of the child", held that an award of custody to the grandparents rather than to one or both of the child's natural parents is clearly erroneous unless exceptional circumstances require that such a custody disposition be made in the best interests of the child.

In its memorandum opinion the district court, with regard to the test for arriving at a custody placement in this case, stated:

"They [Donald and Jean] contend that they need not show that the mother is unfit and overlook the ruling of the Supreme Court case requiring the balancing of the paramount rights of a biological parent with the best interests of the children. However most of the trial time was consumed in attempting to show the weakness and faults of the mother. They have failed to persuade this Court that she is an unfit mother or that she would not be a good mother in the best interests of the children."

We believe the court's foregoing statement demonstrates that it focused on a parental fitness test which is an incorrect application of the law in a custody dispute such as this between a natural parent and a third party (*i.e.* the children's grandparents). Jenny's fitness as a parent is not at issue and is not the test. The test is whether or not there are exceptional circumstances which require that in Jennifer and Allen's best interests they be placed in the custody of their grandparents rather than with their biological mother.

█ The district court's custody determination in a habeas corpus proceeding such as this is a finding of fact which will not be set aside on appeal unless it is clearly erroneous. Rule 52(a), N.D.R.Civ.P. Upon reviewing the record in this case we have a firm and definite conviction that the district court made a mistake in determining that Jennifer and Allen should be placed in Jenny's custody. We are convinced that exceptional circumstances exist in this case requiring the children to be placed in their grandparents' custody and that the district court's custody determination is, therefore, clearly erroneous.

█ Although the district court, as trier of fact, is the judge of the credibility of expert witnesses and the weight to be given their testimony it cannot arbitrarily disregard such testimony. *See, Gardebring v. Rizzo,* 269 N.W.2d 104 (N.D.1978). We are convinced that the district court arbitrarily disregarded the testimony of the experts in this case who were of the unanimous opinion that it would be very detrimental to both Jennifer and Allen to be taken from the custody of Donald and Jean, with whom they have developed a psychological parent relationship, to be placed with their mother, Jenny, with whom Jennifer and Allen have established no parental bond or close, personal relationship.

Dr. Myron Burger is a clinical psychologist with a doctoral degree in psychology from Purdue University who is currently practicing in Mandan and who has been practicing in the profession for 21 years. Upon evaluating Jennifer and Allen, Dr. Burger concluded that the children viewed Donald and Jean as their psychological parents and that it would be a disturbing experience and a difficult task for them to adjust to a new home environment.

Dr. Burger discussed his evaluations with the children in two letters addressed to Donald and Jean's attorney which were introduced into evidence without objection. In his letter discussing Jennifer's evaluation, Dr. Burger states in relevant part:

"Her [Jennifer's] concept of a parental home consists of her grandparents functioning as parents and her relationship with her aunt Sandy and she still places her father in the family constellation. Although this Examiner did not ask direct questions of Jennifer, concerning her biological mother, or where she would prefer to live, it was clear in discussing family activities that the only family she conceptualized or considered was that of her grandparents. At no time in discussing family activity did she mention her biological mother or step-father.

"In my opinion, Jennifer is an emotionally immature and unstable youngster who manifests much anxiety and nerv-

ousness in new situations and has limited intellectual and emotional ability to cope with new situations. It would be very detrimental to her to be transferred to the home of her biological mother with whom she does not have close emotional ties and then be expected to adjust to the demands of a new home setting."

In his letter discussing Allen's evaluation, Dr. Burger states in relevant part:

"Allan seems a more independent and self-assured youngster than his sister.

"It is generally accepted that a youngster should have a stable home environment which provides continuing support, love and guidance. It is evident that this has been provided by Allan's grandparents in the past. In view of the fact that removing him from this relationship with his grandparents would be a disruptive experience in Allan's life and in view of the fact that his biological mother has never established a parental relationship with him and additional information available to this Examiner indicates that she would not be capable of providing such a relationship, it would clearly be in Allan's best interest to remain in his present living situation."

By order of the district court Jennifer was evaluated by Dr. Peter C. Peterson, a clinical psychologist at the Memorial Mental Health and Retardation Center at Mandan, and Allen was evaluated by Dr. Mark J. Hanlon, a clinical psychologist also employed by the Center.

Dr. Peterson testified that Jennifer had emotional problems which were manifested by symptoms such as blinking, sniffing, and clearing of the throat. Dr. Peterson concluded that Jennifer has unresolved grief about her father's death as well as ambivalence and confusion concerning the custody dispute between her mother and her grandparents and that as long as either of those issues are not resolved Jennifer will continue to have emotional problems manifested by her nervous symptoms. In his written psychological evaluation, Dr. Peterson states:

"In my opinion, I believe that this child perceives the Pailings [Donald and Jean] as her parents, and they have functioned in that capacity in a psychological sense throughout her memory. My impressions of the Pailings are that there is an intense and positive emotional bond between both of them and the children. My impression of the environment which they create and have created in the past for these children is that it is positive and considers the children's best interests. At the same time, the natural mother is also concerned with the children's welfare, but there does not appear to be the intense emotional involvement of the grandparents. In my opinion, I believe that in the best interests of these children that they should remain with the paternal grandparents and strict visitation arrangements be made for the natural mother."

Dr. Mark Hanlon, with regard to his evaluation of Allen, testified that Allen perceives only his grandparents and aunt as his family and that taking Allen from his grandparents' custody would hurt him. In his written psychological evaluation, Dr. Hanlon states:

"Allan proved to be a very verbal, friendly and attractive four year old male child. He was cleanly and appropriately dressed for the evaluation and easily formed a positive relationship with the examiner.

"Allan quickly revealed strong feelings regarding his preferences in a living situation. It was clear that he had some concerns that he may be required to live with his mother and he does not wish to do this. Allan clearly identifies his grandparents and aunt as his family. When asked to draw his family he began work stating that the picture would include 'me, Jennifer, grandpa, grandma, my dad who died, and Sandy his aunt'.

"Projective materials as well as the descriptions of a frightening dream consistently indicated that Allan is quite vehemently opposed to living with his biologic mother preferring his grandparents and aunt whom he sees as his family."

Paul Ronningen, a social worker for Burleigh County, performed a home study of

Donald and Jean which was requested by the district court. Mr. Ronningen concluded that Jennifer and Allen have been well cared for by their grandparents who have provided them with a warm, loving and secure home. He also concluded that Donald and Jean have established themselves as Jennifer and Allen's psychological parents, their relationship with whom he could find no negative factors.

The district court, in essence, disregarded the evaluations and conclusions of the foregoing expert witnesses by refusing to give any substantial credence to their opinions. Upon reviewing the entire record we can find nothing which would justify the district court's summary dismissal of the expert testimony in this case.

This Court has often stressed the importance of continuity and stability in a child's life, especially a young child, as factors in determining what custody placement is in the child's best interests. *Egan v. D. M. G.*, 317 N.W.2d 115 (N.D.1982); *J. L. R. v. Kidder County Social Service Board*, 295 N.W.2d 401 (N.D.1980); *In Interest [Custody] of D. G.*, 246 N.W.2d 892 (N.D.1976); *Silseth v. Levang*, 214 N.W.2d 361 (N.D. 1974). In the case of *In Interest [Custody] of D. G., supra*, this Court stated:

> "Continuity in a child's life, especially a young child, is one of the most important factors in determining that child's best interests. This point is well explained in *Beyond the Best Interests of the Child* by Freud, Goldstein, and Solnit [New York: The Free Press (1973)], a book discussed in both the majority opinion and the special concurrence in *Jordana v. Corley*, 220 N.W.2d 515 (N.D.1974). The authors point out that the greatest influence on a child comes from that person or persons the child is used to, fond of, and connected with by experiences, memories, and identification. That person becomes the child's psychological parent in whose care the child feels valued and wanted. With every change in this parent figure, the child's development may regress." 246 N.W.2d at 895.

In this case there is substantial undisputed evidence that Jennifer and Allen's grandparents have provided the children a very loving and secure home and have, without exception, provided for their needs including specialized educational assistance for Jennifer. There is no evidence of the existence of even minor problems regarding the physical custody and care that the children have received from Donald and Jean since December, 1976, when the children first commenced residing with them. Each of the expert witnesses, upon evaluating the children, concluded that the strong psychological parent relationship existing between the children and their grandparents with the apparent lack of personal relationship or bonding between the children and their natural mother warranted, in the children's best interests, that they be allowed to remain in the grandparents' custody.

Upon reviewing the entire record we are convinced that the circumstances of this case constitute exceptional circumstances which require that Jennifer and Allen be allowed to remain in their grandparents' custody. However admirable her intentions may have been, Jenny made a decision in December, 1976, to have her children taken to reside in Donald and Jean's home, and from that time to the present Donald and Jean have provided the children not only with their necessary care and support but with generous amounts of love and affection. As a result the children have formed a very close, personal relationship with Donald and Jean to the extent that, as the experts have testified, the children view their grandparents and their Aunt Sandy as their family to whom they turn for love, guidance and security. Although the evidence indicates that the children have some understanding of the concept that Jenny is their mother it also indicates that they have not established a close, personal relationship or bonding with her. The record indicates, to the contrary, that the children have manifested fear and anxiety about having to leave their grandparents' home to live with or even visit Jenny. The insubstantial character of Jenny's relationship with the children is illustrated by the fact that they

didn't know who she was when she visited them during August, 1980, for the first time during that year.

The reasoning of the Iowa Supreme Court in *Painter v. Bannister*, 258 Iowa 1390, 140 N.W.2d 152, *cert. den.*, 385 U.S. 949, 87 S.Ct. 317, 17 L.Ed.2d 227 (1966), a case with pertinent factual similarities to this case, is persuasive. In *Bannister, supra*, the Iowa Supreme Court, reversing a lower court judgment, held that a seven-year-old boy should remain in the custody of his grandparents, whom he identified as his parental figures, rather than be placed with his biological father. The father asked the maternal grandparents to care for the boy subsequent to an automobile accident which killed the boy's mother and younger sister. The father subsequently remarried and within two years after the boy had been left to reside with his grandparents the father filed a habeas corpus action seeking to regain his son's custody. In discussing its decision to allow the boy to remain in the grandparents' custody, the Iowa Supreme Court made the following relevant statements:

"There is no merit in the Bannister claim that Mr. Painter permanently relinquished custody. It was intended to be a temporary arrangement. A father should be encouraged to look for help with the children, from those who love them without the risk of thereby losing the custody of the children permanently. This fact must receive consideration in cases of this kind. However, as always, the primary consideration is the best interest of the child and if the return of custody to the father is likely to have a seriously disrupting and disturbing effect upon the child's development, this fact must prevail.

\* \* \* \* \* \*

"Mark has established a father-son relationship with Mr. Bannister, which he apparently had never had with his natural father. He is happy, well adjusted and progressing nicely in his development. We do not believe it is for Mark's best interest to take him out of this sta-

ble atmosphere in the face of warnings of dire consequences from an eminent child psychologist and send him to an uncertain future in his father's home. Regardless of our appreciation of the father's love for his child and his desire to have him with him, we do not believe we have the moral right to gamble with this child's future. He should be encouraged in every way possible to know his father. We are sure there are many ways in which Mr. Painter can enrich Mark's life." 140 N.W.2d at 156 and 158.

Like the young boy in *Bannister, supra*, Jennifer and Allen have established a strong parent-child type relationship with their grandparents in whose custody they have a secure and stable family environment. The expert testimony in this case, like that in *Bannister, supra*, is that a change of custody would have a disrupting and detrimental effect upon the children.

We hold that the circumstances of this case constitute exceptional circumstances which require that Jennifer and Allen be placed in the legal custody of their grandparents, Donald and Jean. Having made that determination we must now discuss whether or not there is a countervailing factor in this case which, as a matter of public policy, would require that the children not be placed in their grandparents' custody.

The district court found that Donald and Jean were instrumental in preventing visitations between Jenny and the children and in otherwise preventing Jenny from developing a close, personal relationship with the children. If Donald and Jean wrongfully acted to prevent Jenny from developing a relationship with Jennifer and Allen and as a result of such conduct they were able to establish themselves as the psychological parents that would constitute a countervailing factor against placing the children in Donald and Jean's custody. In reaching a final custody determination the court, after having found exceptional circumstances entitling the grandparents to the children's custody, must balance its responsibility of making a custody placement which is in the

childrens' best interests with its responsibility to further the public policy of not rewarding conduct directed at hindering a biological parent's relationship with the children.

Jennifer and Allen commenced living with their grandparents by Jenny's decision to have the children temporarily live with their father who was then residing in the grandparents' home. When Jenny and James were divorced in October, 1977, she consented to give James legal custody of the children who, she was well aware, were being primarily cared for and supported by Donald and Jean. It was not until July, 1980, subsequent to James' death, that Jenny sought to obtain the children's custody by court action. By that time the grandparents had provided the children's care and support for more than three and one-half years and the psychological parent relationship with the children had been established. Upon reviewing the record we are convinced that neither the grandparents' initial acquisition of the children's physical custody nor the ultimate development of a psychological parent relationship between them and the children was the result of any wrongful conduct by the grandparents or any attempt by them to alienate the children from their mother.

■ Jenny's visitations with the children from the time they commenced living with their grandparents have been sporadic, and the time Jenny has spent with the children has not created a relationship through which the children can feel comfortable and secure with her. Upon reviewing the record in this case we are also convinced that Jenny's sporadic record of visitation with the children and her failure to establish a parental bond or close, personal relationship with them has not been caused by wrongful conduct of the grandparents which, as a matter of public policy, would warrant a determination to not place the children in their custody. We conclude that the district court's determinations in this regard are clearly erroneous.

This Court has recognized that a non-custodial parent has a right to visitation privileges which, as a corresponding right of the child, should be granted to promote the best interests of the child. *Gardebring v. Rizzo*, 269 N.W.2d 104 (N.D.1978); *Egan v. D. M. G.*, 317 N.W.2d 115 (N.D.1982). This Court has also recognized that denial of a parent's visitation rights should occur only when it is in the best interests of the child not to have visitations with the non-custodial parent. *C. B. D. v. W. E. B.*, 298 N.W.2d 493 (N.D. 1980).

The experts who testified in this case were of the unanimous opinion that this custody dispute between Jenny and the children's grandparents together with the uncertainty of the children's future living arrangement has created confusion and emotional upset for both Jennifer and Allen. We are hopeful that with time, through regular visitations, Jenny can establish a close relationship with the children through which she will earn their love, confidence and respect. If she can do so, Jenny will greatly enhance and enrich Jennifer and Allen's lives. However, we believe that Jenny's visitations must initially be arranged so as to not add to the children's confusion and pain. It is absolutely crucial, for the children's best interests, that Jenny and the grandparents cooperate with each other in an amiable atmosphere free from antagonism and hostility. Whether or not they can achieve that degree of cooperation cannot be predicted by this Court. Dr. Peterson testified that he did not believe the antagonism between Jenny and the grandparents would likely develop into a positive relationship in the future, and he suggested that in order to avoid an atmosphere of conflict it would be advisable to have a third party transport the children for visitations with Jenny, "to pick them up and drop them off or whatever." We believe that, at least initially, Dr. Peterson's suggestion should be adopted as a part of the visitation arrangements. The evidence indicates that in the past the children have become extremely upset when Jenny attempted to take them from the grandparents' home with her for visitation. Having a friend or neighbor, with whom Jennifer and Allen

756

are familiar and in whom they have confidence, transport them to a meeting place for their visitations with Jenny would hopefully eliminate the tense atmosphere of the occasion and relieve the children's feelings of anxiety.

For these visitations to be beneficial, Jenny and the children must develop a personal relationship filled with trust and confidence. To encourage the development of such a relationship, we believe that for one year Jenny should be allowed to visit with the children in Bismarck at locations suitable for Jennifer and Allen within the city for one day each weekend, alternating between Saturday or Sunday, from 10:00 a. m. until 6:00 p. m. Thereafter, Jenny should be allowed two visitations each month from 10:00 a. m. Saturday morning until 4:00 p. m. on Sunday afternoon which may be outside the city but which must be within the State of North Dakota. Jenny should give Donald and Jean advance notice, which they should receive 72 hours prior to the requested visitation, and should designate in her notice a time and location at which she desires to have the children delivered to her. Donald and Jean should then arrange to have a third party take the children to the appropriate meeting location at the designated time. After the visit Jenny should then return the children to Donald and Jean's home after their visitation, without the use of a third party unless contact therefrom results in emotional trauma. To avoid detrimental consequences to the children resulting from continuous litigation over their custody we recommend that no new petition for change in custody or visitation be entertained by the district court for a period of two years unless a change in circumstances surrounding the children constitutes an emergency.

Donald and Jean have filed a motion requesting this Court to take judicial notice of a judgment of divorce between James and Jenny Mansukhani entered by the District Court of Ward County on November 2, 1981, subsequent to the trial court's determination and entry of judgment in this case. We conclude that, this Court having reversed the trial court's custody decision

and having placed custody of the children with Donald and Jean as requested by them on this appeal, it is unnecessary to grant the relief requested by their motion. Accordingly, without considering its merits, we deny the motion.

In accordance with this opinion we reverse the judgment of the district court, and we remand with directions that the court enter judgment placing custody of Jennifer and Allen with Donald and Jean and awarding Jenny visitation rights pursuant to the restrictions and limitations suggested in this opinion.

VANDE WALLE and SAND, JJ., concur.

PEDERSON, J., concurs specially.

HUNKE, District Judge, sitting in place of Paulson, J., disqualified.

PEDERSON, Justice, concurring specially.

Ordinarily I dissent when this court encroaches on the trial court function of determining matters which involve discretion, or credibility, or the making of findings of fact. In this case, because it involves some extraordinary circumstances, I have concurred in the disposition proposed by Chief Justice Erickstad. I would not want it inferred that this is an invitation to seek, in ordinary domestic relation cases, "revision on appeal in all particulars, including those which are stated to be in the discretion of the court," as appears to be authorized by § 14–05–25, NDCC. The validity and extent of that authorization has never been argued or researched.

HUNKE, District Judge, dissenting.

Although the majority opinion is certainly a well reasoned and persuasive one, I must respectfully dissent. I fear that in what undoubtedly was as difficult and close a case for the trial court as it is for this court, my appellate brothers in the majority have merely substituted their opinion for that of the trial judge. In doing so the majority have gone beyond, however unintentionally, the constraints of Rule 52(a),

N.D.R.Civ.P., which limit review of findings of fact to a determination of whether or not they are "clearly erroneous." Child custody determinations are deemed to be "findings of fact" within the meaning of that rule as determined in a long line of cases. Such was established initially in *Ferguson v. Ferguson*, 202 N.W.2d 760 (N.D.1972), survived some questioning in a concurring opinion in *Silseth v. Levang*, 214 N.W.2d 361 (N.D. 1974), and returned to unanimity in a number of cases since then. See, e.g., *Matson v. Matson*, 226 N.W.2d 659 (N.D.1975); *DeForest v. DeForest*, 228 N.W.2d 919 (N.D. 1975); *Keator v. Keator*, 276 N.W.2d 135 (N.D.1979); and *Muraskin v. Muraskin*, 283 N.W.2d 140 (N.D.1979). The evidence in this case should properly be viewed as not only conflicting in many respects, but as so substantially supportive of the trial court's findings of fact and custody determination that, disregarding what our own initial determination might have been, we should not hold the trial court to be clearly erroneous in its studied determination.

While the length of the trial judge's thirty-six page memorandum opinion containing his findings of fact is of no appellate significance, it is indicative of the careful analysis and scrutiny given to the evidentiary facts found by the trial court to which it correctly applied the pertinent law. The district court considered not only the facts recited in the majority opinion, to which it gave varying weight (as indicated by the trial court's finding that the moral misconduct of Jenny to which the majority points was never in the presence of or to the knowledge of the children and simply did not affect in any way their best interests and welfare), but much more. This dissent is not enhanced by recitation of the remaining facts upon which the trial judge partially premised his determination, but fair examples are the numerous items of evidence upon which the trial judge concluded that the grandparents Donald and Jean deliberately thwarted and frustrated Jenny's efforts at visitation and that they conspicuously failed to assure the children of their genetic mother's love for them; the trial court apparently observing more percep-

tively the caveat of the Iowa Supreme Court in *Bannister*, cited by the majority, to the effect that a distressed parent:

"... should be encouraged to look for help with the children, from those who love them *without the risk of thereby losing the custody of the children permanently.*" 140 N.W.2d 152, 156. (Emph. added).

The trial court also considered the comparative ages of the parties competing for custody, and properly so in view of this court's opinion in *Jordana v. Corley*, 220 N.W.2d 515 (N.D.1974). The district judge noted the disparity in age between the children and the grandparents and observed that adoption agencies are so concerned with the age of prospective adoptive parents so as to ensure a long, secure, active, flexible and stimulating relationship with the child, that the disparity between the grandparents and child in this case would prohibit adoptive permission. It should be noted that when these two children are 17 and 15 years of age, respectively, Donald will be 66, unquestionably a wonderful age to be. But, human experiences should suggest that a person of that age should not be burdened with the responsibility of two teenage children; particularly when their genetic mother is eagerly available to provide them with the necessary love, care, guidance and counseling so desperately needed by teenage children in a world of often conflicting and rapidly changing values.

The trial judge also carefully weighed each of the ten enumerated guidelines given to the courts by our Legislature in N.D. Cent. Code 14–09–06.2 to assist in resolution of child custody disputes and, on balance, determined that the best interests of the children dictate their custodial placement with Jenny. Those ten separate findings of fact alone would be sufficient to deter me from concluding under Rule 52(a) that the trial court's decision on the ultimate question of the best custodial placement was clearly erroneous. As to observation on the "exceptional circumstances" which exist in this case, reasonable persons could just as

readily conclude that those "exceptional circumstances" weigh more heavily in favor of placement of the children with Jenny, particularly considering that her right as the sole surviving genetic parent to keep her children is "paramount"—absent exceptional circumstances mandating removal—and her rights being of "constitutional dimension" and "superior to that of anyone else", including the grandparents. *Raymond v. Geving*, 74 N.D. 142, 20 N.W.2d 335 (1945) and *McGurren v. S. T.*, 241 N.W.2d 690 (N.D.1976). In *Hust v. Hust*, 295 N.W.2d 316, 318 (N.D.1980) Justice Vande Walle spoke for a unanimous court when he said:

"This court has recognized that parents have a paramount and constitutional right to the custody and companionship of their children superior to that of any other person.... Although the right of a parent to the custody of his/her child is not absolute, the courts are reluctant to remove a child from the parents' custody unless it is necessary to prevent serious detriment to the welfare of the child."

He continued by quoting Justice Sand in an earlier decision:

" '... it is not reason enough to deprive parents of custody that their home is not the best or most modern that could be offered to the child, so long as the child does not suffer physical or moral harm, or lack of food or clothing. Poverty, lack of education or of culture alone are never justification enough for severing the ties that bind families together.' "

Next I fear that the majority unnecessarily assumes an adversary point of view when it suggests that the trial court misperceived the correct test to apply in custodial disputes. The majority states that Judge Garaas "focused on a parental fitness test which is an incorrect application of law." Obviously, application of the parental fitness test solely would be incorrect today; however, I do not believe Judge Garaas applied that test. While the majority correctly quotes that part of the memorandum opinion relating to Donald and Jean's futile efforts to prove Jenny an unfit mother, that is only an isolated portion of the lengthy memorandum opinion. It is quite apparent to me that the trial judge correctly applied the "best interests of the children" test and precisely followed this court's instructions in its prior opinion in *Mansukhani v. Pailing*, 300 N.W.2d 847 (N.D.1980), *cert. den.*, —— U.S. ——, 102 S.Ct. 98, 70 L.Ed.2d 88, as indicated by the following portions of the district court's opinion:

"The ruling of the Court on appeal was that Plaintiff must have an evidentiary hearing to determine where the children should be dependent on what was in the best interest of the children. This Court was instructed to balance the rights of a biological parent with the best interests of the children."

\* \* \* \* \* \*

"*Without regard* to the fact that the Plaintiff is the biological mother to the children, this Court finds that the best interest of the children and the best welfare of the children dictates that the children be returned to the Plaintiff." (Emph. added).

\* \* \* \* \* \*

"This Court has found after listening and seeing the witnesses that the best interest of the children would be served by having them in custody of the Plaintiff *without regard to the fact that she is the sole remaining biological parent.*" (Emphasis by trial court).

\* \* \* \* \* \*

"The evidence shows that the *best interests of the children* are served by granting the petition for writ of habeas corpus and allowing custody of the children to be with the Plaintiff mother without regard as to her paramount right as a natural parent. However, bestowing on her the additional preference and rights to custody as a parent, this Court is overwhelmingly convinced that it can do nothing else in *the best interests of the children.* The children have lost their father by an accident in 1980. They do not deserve to lose their sole remaining parent, their mother, when the evidence shows that it

is in *their best interest* to have a home with the Plaintiff, her husband and their two half-sisters." (Emph. added).

The majority opinion stresses the psychological parent relationship which developed between the children and the grandparents. Such psychological bonding is the point pressed by the authors of *Beyond the Best Interests of the Child*, Goldstein, Freud, and Solnit [New York: The Free Press (1973)], a scholarly work previously given judicial credentials by members of this court at least as early as *Jordana v. Corley*, 220 N.W.2d 515 (N.D.1974). It should be noted that the authors of that work concede in a prefatory manner that, by virtue of their respective professorial specialties, their approach to and emphasis on the difficult question of child placement "... is exclusively on the child's psychological needs" (p. 4), to the exclusion of other factors, even the mere physical well-being of the child. Other similarly sincere scholars might well conclude that the simple physical needs of a small baby (as was Allen when placed with Donald and Jean) such as feeding, bathing, diapering, bedding, and close physical affection may be equally as important as are the psychological aspects so crucial to healthy child growth and development. The trial court was well aware of the Pailings' claims that they had become the psychological parents of the children, but seems to have been of the opinion that the grandparents deliberately, although in good intention, substituted themselves as the psychological parents of the children and effectively severed the attachment of the children to their natural mother. Judge Garaas was disturbed by the fact that on Allen's birthday on August 1, 1980, a week after the death of his father, the grandparents did not even let the children know that their only remaining parent was coming to visit them, such failure of the grandparents resulting in that sad confrontation on that date as described by the majority opinion. However, Judge Garaas found that a subsequent overnight visit that same month:

"... was delightful to all concerned. The children were content and expressed a desire not to leave according to [Jenny].

Jennifer talked about 'belonging' there with her mother."

The majority opinion places great reliance on the opinions of the expert witnesses which leads to my next fear that the majority may have unfairly characterized the trial court's careful consideration and weighing of the expert testimony (which was its exclusive province to do) by stating that Judge Garaas essentially disregarded the evaluations and conclusions of the experts by a "summary dismissal" of their testimony. Certainly now that we are well into an era of division and specialization of knowledge, the courts should search out the aid and assistance of expertise in any given field, including the social sciences. However, in receiving the benefits of that expertise, the courts should not even allow the appearance that they might be pursuing a form of abdication of their duty and authority to render their own sound judgment, even though it may be buttressed by expert support. I cannot conclude that the trial court summarily rejected the expert testimony, but instead I am of the opinion that he carefully weighed the expert testimony, accepting some but rejecting most of it, as indicated by the following:

1. He concurred with the social worker's home study report that Jenny and her second husband would provide Jennifer and Allen "with a secure and stable home and would give them the love and understanding they need plus parental guidance and supervision."

2. As to the home study of the grandparents' home, the trial court placed little weight on its conclusions because the social worker involved went beyond the court's request and directions and included conclusions which the social worker was not only not qualified to reach but which were based exclusively on hearsay information.

3. He felt that Dr. Burger's examination "was made hurriedly" for use by the grandparents in seeking temporary stay orders of the initial district judge's decision on the petition for writ of habeas corpus subsequently reversed by this court. Judge Ga-

raas felt Dr. Burger relied far too heavily on the unreliable expressions of children of the tender ages of four and six years and proceeded to a detailed analysis of Dr. Burger's testimony and reports.

4. As to Dr. Hanlon, the trial judge found that he did not even know that Jenny had been effectively denied visitation rights for the year immediately preceding his examination of the children, which factor Dr. Hanlon admitted would affect his opinion had he known of it. The trial judge chose not to give much weight to this expert's conclusions which he felt were based upon "dreams, wishes, . . . or other such indirect and vague methods . . . ."

5. Similarly did the trial court reject Dr. Peterson's testimony, finding that the conclusions reached by him were not only based upon insufficient factual information but that Dr. Peterson was "concerned with only mental health" over and above "the best interest of the child."

As was the trial judge, I am not so willing to surrender to experts who have not yet labored in the rocky vineyard of courtroom child custody disputes.

Lastly, I deem it appropriate to comment upon the procedural vehicle chosen by Jenny to assert her claims. Apparently her attorneys felt that a petition for writ of habeas corpus in a child custody dispute would be used only in its earlier classic form to test rather summarily the legal authority of the grandparents to "detain" the children (and of course they had none whatsoever). That clearly was an erroneous assumption on the part of Jenny as indicated by this court's prior opinion in this case and others. I suggest that it would have been better in the past and will be in the future for interested parties to proceed by motion in the divorce action to which Jenny and her deceased first husband were parties, with an appropriate substitution of a party for the deceased husband, the judgment in which is the only viable legal document determinative of the legal custody of the children, with the exception of this awkwardly structured proceeding.

To paraphrase a concurring opinion in *Jordana v. Corley*, supra, I hope the majority opinion is not erroneous at all, but I fear that it may be. For the sake of these two dear children, I hope that the fears and doubts which compel this dissent will be shown by future events to be unwarranted.